LOCAL UNION NO. 35 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Plaintiff-Appellant,

v.

CITY OF HARTFORD, City Manager of the City of Hartford, Commission on Human Relations of the City of Hartford, Contract Enforcement Committee of the City of Hartford, and Ronald Fletcher, Individually and as Senior Field Representative of the Commission on Human Relations of the City of Hartford, Defendants-Appellees.

No. 327, Docket 79–7253.

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1980.

Decided June 13, 1980.

Van Graafeiland, Circuit Judge, dissented and filed opinion.

William S. Zeman, West Hartford, Conn. (Joel M. Ellis, West Hartford, Conn., of counsel), for plaintiff-appellant.

Richard F. Bellman, New York City (Eisner, Levy, Steel & Bellman, P. C., New York City, Hubert J. Santos, Corp. Counsel, Richard M. Cosgrove, Deputy Corp. Counsel, Hartford, Conn., of counsel), for defendants-appellees.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and NICKERSON, District Judge.[*]

NICKERSON, District Judge.

Plaintiff Local Union No. 35 of the International Brotherhood of Electrical Workers ("the Union") appeals from a judgment entered for defendants in the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, Judge. The defendants are the City of Hartford ("the City") and certain City agencies and officials responsible for enforcing its Affirma-

[*] United States District Judge for the Eastern District of New York, sitting by designation.

tive Action Ordinance ("the Ordinance") and Affirmative Action Plan ("the Plan"). The Union is a labor organization representing all electrical workers who work for any employer with whom the Union has a collective bargaining agreement in Hartford County, five other Connecticut counties and one town in Rhode Island.

The complaint sought declaratory and injunctive relief against enforcement of the Ordinance and the Plan and alleged that as implemented they discriminate against nonminority Union members on the basis of race and thereby violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2(c)), the Connecticut Constitution, and various provisions of the Connecticut General Statutes.

## I

The events leading to the enactment of the Ordinance and Plan commenced in 1970, soon after the City experienced serious disturbances in lower income minority neighborhoods. A group of community and civil rights leaders approached Deputy Mayor Nicholas Carbone, a member of the Court of Common Council ("the Council") since 1969, and chairman of its committee responsible for the City's then building program of over $100 million. The leaders protested the discrimination against minorities in the building trades and insisted that minority persons be given the opportunity to work on the expected projects. They asked Carbone to try to get the unions and the contractors to remedy the pervasive pattern of discrimination.

Carbone proceeded to bring together for negotiations the contractors, the unions, and the civil rights leaders. In September 1972, after negotiating for about one and a half years they finally agreed upon and made public an affirmative action plan providing for every good faith effort to achieve at least a fifteen percent level of minority and female employment. The plan was substantially the same as that later adopted as the Plan.

However, the agreed plan provided no method of enforcement, and no further action was taken to implement it. Indeed, only a few of the union locals subscribed to what their representatives had negotiated. In mid-1974 community and civil rights leaders again approached Carbone to complain. He then informed the building trades representatives that the City could not be a party to the exclusion of minority workers from City jobs and that he would introduce legislation to implement the agreed plan. At his request representatives of the unions and the contractors helped draft the Ordinance.

On February 9, 1975, the Council, the City's chief legislative body, adopted the Ordinance, reciting as its purpose the ensuring of "equal employment opportunity for minority group persons and women" in the City's major construction contracts. Shortly thereafter, the Council, pursuant to the Ordinance, adopted the Plan.

## II

The Ordinance defines "minority group persons" to include persons of Black, Puerto Rican, Spanish-American, Oriental or American Indian ethnic or racial origin and identity and women, and declares and finds, among other things, that

"(a) Many contractors, labor unions, hiring halls, crafts and trades in the construction industry in the Greater Hartford area have discriminated, and continue to discriminate, against minority group persons and women.

"(b) It is the intention of the City not to aid or abet such discrimination by awarding contracts to contractors who practice or have practiced discrimination against minority group persons and women, or who have subcontracted to, or engaged the services of, individuals and organizations that deny or have denied equal employment opportunity to minority group persons and women.

"(c) The continuing effects of past and present discrimination against minority group persons and women by the construction industry may be prevented, mit-

igated and/or eliminated by an affirmative action plan.

"(d) There is a sufficient number of qualified group workers and women in the Greater Hartford Area to make such an affirmative action plan feasible and desirable."

The Ordinance requires all City construction contracts providing for payments of at least $10,000 to incorporate an Affirmative Action Plan to be adopted by the Council establishing reasonable minimum percentage goals for minority group and female employment in the construction industry. Principal responsibility for encouraging the employment of minorities and women is placed on the prime contractors. As a condition of acceptance of their bids they must obtain from their subcontractors and unions or other employment referral organizations affidavits agreeing to the Plan.

Unions, such as the Union here, which do substantial work outside the Greater Hartford Area and decline to adopt the Plan as a contractual provision can be certified as eligible to do city work if, among other things, they have accepted or will in the immediate future be accepting adequate minority and female participation in their operations and have submitted an affidavit stating that they agree with and will make a good-faith effort to comply with the Plan. A contractor or union previously certified but not in compliance with its affidavit is subject, after a public hearing, to, among other things, possible decertification and preclusion from doing City work pending compliance or a good faith effort to comply.

The Ordinance also provides for the designation of one or more job referral banks, which are required to seek out and compile lists by trade of all qualified minority and female workers in the area and make those lists available on request to any contractor or union. The Council thereafter designated Project Leap of the Greater Hartford Urban League as a job referral bank.

The Plan provides that those agreeing to it will make every good faith effort to achieve employment of minority and female employees of at least fifteen percent on City projects and make a good faith effort to implement this goal on non-city jobs. The Ordinance defines good faith effort to mean "every reasonable attempt" to comply with the Ordinance and the Plan and "every possible measure" to achieve the level of participation of minority and female workers established by the Plan.

### III

Incorporated in each of the union's collective bargaining agreements with the contractors is a so-called "Principle Labor Agreement" negotiated by the Union with the local chapter of the National Electrical Contractors Association, Inc. That agreement makes the Union "the sole and exclusive source of referral of applicants for employment" as electrical workers with the contractor and provides that applicants will be referred without discrimination against them "by reason of membership or non-membership in the Union."

The "Principle Labor Agreement" also provides that the Union will maintain a register of applicants for employment in four groups and an "Out of Work List" containing all applicants within each group in the chronological order of the dates they sign the list. Referrals are required to be made first from Group I in the order of the applicants' places on the list, then in the same manner successively from the other groups. Thus no applicants in a higher numbered group can be referred unless all those in lower numbered groups are working.

Group I includes those applicants who have had four or more years experience, are residents of the area, have passed a journeyman's examination given by the Union or one of its affiliates or have been certified by any Inside Joint Apprenticeship and Training Committee, and have been employed for at least one year of the last four under a collective bargaining agreement between the Union and the contractor. Group II includes applicants with the same qualifications except that they are not required to be residents of the area or to have been employed under a collective bargain-

ing agreement between the Union and the contractor. Group III includes those who have had two or more years experience, are residents of the area, and have been employed for at least six months in the last three years under a collective bargaining agreement between the Union and the contractor. Group IV includes applicants who have worked at the trade for more than a year.

## IV

On October 31, 1975, the Union, which had collective bargaining agreements with numerous contractors having City contracts, was certified under the Ordinance, having submitted the requisite affidavit stating that it would not discriminate, would eliminate any effects of past discrimination, and would make a good faith effort to comply with the Plan. Despite the provisions of the collective bargaining agreements the Union had not maintained or made referrals from an "Out of Work List" for thirty years. However, in January 1976, after adoption of the Ordinance and Plan, the Union began to make referrals from such a list to all jobs including City contracts. The City first learned of this in January 1977 when several contractors advised the City that they were unable to meet the Plan's fifteen percent goal as to electrical workers. Investigation revealed that the Union was referring only those who had signed the list and in the order in which they had signed.

Although in theory non-union applicants were free to sign the list, in fact it contained only Union members. Furthermore, everyone on the list was in Group I. As of February 2, 1977, of the total Union membership of 550, 321 were not working. Of the 41 minority members (31 Black, 5 Spanish-surnamed, and 5 American Indian) seventeen were not working. Of the 321 on the list of the first minority worker was number 85.

The City Manager ruled that the Union by making referrals only from the list in chronological order was not in compliance with the affidavit it had submitted to obtain certification. He referred the matter to the Contract Enforcement Committee of the Council. The Union thereupon commenced this action, which was stayed pending action by the Committee.

After holding hearings the Contract Enforcement Committee on July 7, 1977, concluded that the Union was not making a good faith effort to comply with its affidavit and that unless the Union within thirty days complied or showed a good faith effort to comply with the Plan the Union would be decertified. Final action on the committee's ruling was held in abeyance pending a determination by the District Court.

In the hearings before District Court the parties agreed that there were no material issues of fact in dispute and made cross motions for summary judgment. Although the Ordinance defines the term minority group persons to include women, both parties treated the case as involving only alleged racial discrimination.

Judge Blumenfeld postponed a decision pending the decision in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). After that decision was rendered the parties submitted further briefs. The court then granted defendants' motion on December 11, 1978, 462 F.Supp. 1271, and thereafter denied the Union's post-judgment motions.

## V

The Equal Protection Clause of the Fourteenth Amendment prohibits the City from denying "to any person within its jurisdiction the equal protection of the laws." The central issue in this case is whether non-minority Union members are denied the equal protection of the laws if the City disqualifies the Union from participating in City construction work while the Union makes referrals only from the "Out of Work List" in chronological order.

█ It is well settled that laws which brand persons as inferior because of their color or race and thereby act as a stimulant to race prejudice are inconsistent with the Equal Protection Clause. Indeed, this was

suggested as early as a century ago in *Strauder v. West Virginia*, 100 U.S. 303, 308, 25 L.Ed. 664 (1880). By outlawing segregation in 1954 the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), gave concrete expression to the constitutional mandate to eliminate such race consciousness and prejudice. However, few would claim that since that date the effort to eliminate discrimination has been an unqualified success. In fact the failure to change by racially neutral means the still widespread discrimination in our country has led to a variety of so-called affirmative action programs designed to advantage minority persons.

Though racially conscious, these programs may primarily be intended not as deferred recompense for past injustices but rather as the most, perhaps the only, effective way in the long run to end or to mitigate racial divisions and to bring about the moral equality of the races. Affirmative action programs to the degree they disadvantage non-minority individuals do so not on the theory that such persons are inferior but on the supposition that unless such programs are implemented there is faint hope of reducing race consciousness and of assuring that the time will come when the treatment of individuals will be based on their talent and not on their race.

Undeniably there are risks in affirmative action programs. In the short run they may exacerbate rather than diminish race consciousness. They may cause resentment. They may foster the belief that some need special advantages because they cannot succeed on their merits. This court has therefore proceeded cautiously, approving affirmative action plans where their purpose and need has been appropriately established, their goals have been reasonable in terms of the affected minority, and their tendency to reinforce race consciousness has been minimized.

■ A governmentally imposed affirmative action plan can only be sustained if its purpose and effect are to remedy the consequences of present or past discrimination.

*Fullilove v. Kreps*, 584 F.2d 600 (2d Cir. 1978), *cert. granted*, 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979). Justice Powell indicated in *Regents of the University of California v. Bakke, supra*, 438 U.S. at 301–02 & n.41, 98 S.Ct. at 2754–55 & n.41, that judicial, legislative or administrative findings of the discrimination must support such a purpose. In the *Fullilove* case this court sustained under the Equal Protection Clause section 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2), which mandates that at least ten percent of the monies appropriated pursuant to the statute shall be expended for minority business enterprises. The court held that Congress had the purpose of remedying the effects of past discrimination and had "sufficient evidence" of past discrimination in the construction industry. Earlier *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973), sanctioned hiring quotas of Black and Puerto Rican policemen aimed at eradicating past discrimination where the District Court had found that the patrolman's examination had for many years resulted in invidious discrimination.

■ In the present case the purpose of and need for the Ordinance and Plan were established beyond question. Previous efforts to mitigate or eliminate discrimination in the local building trades had clearly met with failure. In the Ordinance, the Council, a competent and responsible legislative body subject to political restraints, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 783 n.4, 82 L.Ed. 1234 (1938), declared its purpose of ensuring equal employment opportunity for minority and female workers and made findings of past and present discrimination. Those findings were not attacked in the District Court. Indeed, when the contractors and the unions negotiated the voluntary plan and later assisted in drafting the Ordinance they acknowledged that minority workers were seriously under-represented in the building trades. That under-representation was documented in studies by the University of Connecticut, the Connecticut Labor

Department and the City's Human Relations Commission. Moreover, racial discrimination in the construction trades on racial grounds has been found so often by the courts as to make it a proper subject for judicial notice. *United Steelworkers v. Weber*, 443 U.S. 193, 198 n.1, 99 S.Ct. 2721, 2725, 61 L.Ed.2d 480 (1979).

■ Although only 7.45 percent of the Union's members are minority individuals and the percentage of blacks employed as skilled electricians in Connecticut actually decreased from 0.9% to 0.7% between 1960 and 1969, the Union claims that there was no legislative finding that it had discriminated in the past. The Union introduced no proof that it was an exception to the general finding. But in any event a valid affirmative action plan need not be based on a particularized finding of past discrimination by every employer or union affected. It is enough that there is a finding of discrimination in the industry concerned. To hold otherwise would enable parts of the industry to frustrate the plan by assigning various functions to those who had not previously discriminated. Other circuits have upheld affirmative action plans granting racial employment preferences where a legislative or administrative body charged with the responsibility made determination of past discrimination in the industries affected but did not make specific findings directed at those attacking the programs. *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Associated General Contractors of Massachusetts, Inc. v. Altshuler*, 490 F.2d 9 (1st Cir. 1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). These decisions were cited with apparent approval by Justice Powell in the *Bakke* case, 438 U.S. at 301–02, 98 S.Ct. at 2754–55.

Moreover, whether or not the Union discriminated in the past, to acquiesce in the Union's position in this case would be to permit perpetuation of discrimination. The Union, which for thirty years had not maintained an "Out of Work List," now insists that referrals must be made only from such a list in chronological order. The list contains solely Union members. Yet it is evident that there are other unemployed, qualified and licensed electrical workers in the area, and the Council found that there were sufficient qualified minority and female workers to make feasible the fifteen percent goal of the Plan in respect to employees on City projects. Indeed, the union introduced no proof suggesting otherwise.

While the collective bargaining agreements between the Union and the contractors by implication gave non-members the right to sign the "Out of Work List," there is no showing that anyone not a Union member knew of the existence of the list. Even if a non-Union member had known of the list and had signed it, such a worker in all likelihood would not have been qualified to be included in Group I which had priority for referrals. To be listed in Group I an applicant must have been employed for at least one year of the last four under a collective bargaining agreement to which the Union was party. For most if not all non-union workers, therefore, it would probably have been futile to sign the list. They would not have been referred for employment until all Union members were employed.

By making provisions for job referral banks the Ordinance contemplated that a union having a membership of less than fifteen percent minority and female workers could comply with the Plan by referring qualified non-Union workers. Project Leap, the job referral bank designated by the Council, evidently had the names of such workers, for when the Union failed to refer minority electricians, the City advised one contractor that it was required to use other sources and should apply to Project Leap to "assure" compliance with the Plan. The fact that the Union list contains the name of not a single non-Union person indicates that the Union made no effort to recruit qualified non-union minority and female workers, from the job referral banks or otherwise, into its referral system. If the Union is permitted to restrict minority

and female employment to its forty-one members, the rather modest goal of employing fifteen percent minority employees on City projects may be effectively frustrated.

The Union now suggests for the first time that the fifteen percent goal may be too high because it is in excess of the percentage of the minority population in the Greater Hartford Area. However, in the District Court the Union did not attack that goal as unreasonable. Nor did the Union make the contention below that the group from which construction workers might reasonably be drawn was less than fifteen percent minority and female or refute the legislative finding that sufficient qualified minority and female workers were available to make the hiring of fifteen percent minorities on City contracts feasible and desirable. Furthermore, the representatives of both the unions and the contractors agreed in 1972 that a fifteen percent goal was reasonable.[1]

Finally, we think that the implementation of the Ordinance and Plan as shown in this record is calculated to attain the fifteen percent objective while causing as little resentment as possible. This case is not like those relied on by the Union.

In the *Bridgeport Guardians, Inc.* case, *supra*, while approving hiring quotas of Black and Puerto Rican patrolmen, this court disapproved the use of quotas for promotion to ranks above that of patrolmen. The court found that there was no justification for promotion quotas because the promotion examinations were not found to be discriminatory and the quota would have a "harsh" impact on the few persons who had embarked on a police career with the expectation of advancement and would "only exacerbate rather than diminish racial attitudes." *Id.* at 1341.

Similarly in *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420 (2d Cir. 1975), the court reversed the District Court's order that the New York State Department of Correctional Services promote to sergeant at least one Black or Hispanic employee for each three white employees promoted until the Blacks and Hispanics made up the same combined percentage of sergeants as they did of correction officers. The Court's opinion stated that the proof of past racial discrimination in the appointment of supervisory personnel was inadequate and that those bypassed for advancement would be "a small number of readily identifiably candidates for promotion." *Id.* at 429.

On the other hand, in the *Fullilove* case this court sustained the set aside of ten percent of federal public works money for minority businesses and deemed any resentment likely to be caused by the act to the minimal since the amount set aside was only 25 percent of the funds expended yearly on construction work in the United States, and the effects were not "identifiable," that is, "concentrated upon a relatively small, ascertainable group of non-minority persons." 584 F.2d at 607.

Similar criteria were used by Mr. Justice Powell in his opinion in the *Bakke* case finding invalid the program of a medical school reserving sixteen of one hundred seats for disadvantaged minority students. While he approved preferences to minorities where competent and responsible public bodies made findings of past discrimination, he referred to the "deep resentment" likely to be aroused by all classifications based on race, 438 U.S. at 294–95 n.34, 98 S.Ct. at 2751 n.34, and concluded that the exclusion of non-minority applicants from any competition for the sixteen seats would be viewed as "inherently unfair" both by the general public and by those who applied for admission to state universities. *Id.* at 319 n.53, 98 S.Ct. at 2763 n.53.

The Union, citing these cases, contends that the Plan requires that minority Union members on the "Out of Work List" be

---

1. Whether it is reasonable to require that fifteen percent minority workers be hired on City projects is a question different from, although perhaps related to, the question of whether seeking to have fifteen percent minority membership in the Union is a reasonable goal. This opinion need not and does not reach the latter issue.

"jumped over" the "readily identifiable" non-minority members on the list. This contention is based on the premise that this is the only way the Union can make a good faith effort to attain the fifteen percent goal.[2]

For reasons already discussed the premise is faulty. The Union can seek out and refer other qualified workers. Chronological referrals from a list including both Union and non-Union members and containing at least fifteen percent minority female persons might well have met the City's goal.

Qualified minority and female workers who are not Union members may well have been out of work longer than any persons on the Union's list, and perhaps no Union member would be chronologically "jumped over" if referrals were made from a list including all those qualified to work. The court does not have before it a situation where referrals are made chronologically from a list containing all those qualified but less than fifteen percent minority or female persons. We need not rule on the validity of a jumping of minority and female over non-minority workers in such circumstances. Nor need we decide whether a non-minority Union member may enjoin the Union from referring out of turn a minority Union member on the present "Out of Work List."

Neither the decisions of this court nor the Supreme Court sanction the Union's frustration of the Plan through the expedient of restricting referrals to the Union list, indeed, for practical purposes, to its own membership, and then claiming that those few are readily identifiable. In instances in which the decisions disapproved racial quotas the list from which appointments could be made included all those legally qualified for the position. That is not the case here.

Resentment there may be if the Union is required to make inquiries of a job referral bank and to compile a list including at least fifteen percent minority and female workers. But the effect of such a requirement is not comparable to the effect of the direction for quotas for police promotion which this court disapproved in the *Kirkland* and *Bridgeport Guardians, Inc.*, opinions or to the effect of the program rejected by Mr. Justice Powell in the *Bakke* case. Any indignation here can hardly be as intense or appear as plausible. There is no issue of preferring someone over another presumably more qualified, at least on paper. Nor has it been shown that in order to show compliance the Union must refer a minority Union member out of chronological turn.

▮ For the foregoing reasons we hold that the Ordinance and Plan as implemented do not infringe the Equal Protection Clause. To accede to the Union's contentions would be to require the City to condone conditions the Equal Protection Clause was designed to end.

## VI

The Union contends that the Ordinance and Plan are invalid because they are inconsistent with section 703(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c), which provides in pertinent part that it shall be "an unlawful employment practice" for a labor organization to "fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status . . . as an applicant for employment, because of such

---

2. The Union points to a statement by a representative of the City's Commission on Human Relations at the hearing before the Contract Enforcement Committee that "My position was that in order to comply they would have to reexamine their rotation list and perhaps the rotation list should not be used. . . . My position was that the rotation list would have to be rethought and reexamined and, yes, minorities would have to be moved up." It is clear from the context of this statement that the representative of the Commission contemplated that the Union could go outside the "Out of Work List" to "move up" minorities. In any event the decision of the Contract Enforcement Committee decertifying the Union merely concluded that "use of the 'out of work' list" was clear evidence of lack of a good faith effort to comply.

individual's race, color, religion, sex, or national origin."

■ The argument is that the Plan and Ordinance violate this section by depriving non-minority and male workers of employment opportunities on the ground of race, of color or sex. This contention is foreclosed by *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). There the Court had before it the language of section 703(a), 42 U.S.C. § 2000e–2(a) prohibiting, in terms practically identical to section 703(c), an employer from refusing to hire because of an individual's race, color or sex.

The Court held that the prohibition did not condemn all private, voluntary, race conscious affirmative action plans, and that a plan of an employer and a union was valid where it reserved for black employees 50% of the openings in an in-plant craft training program until the percentage of black craft workers in the plant was commensurate with the percentage of blacks in the local labor force. The Court noted that the plan, like Title VII itself, was designed to break down old patterns of racial segregation and hierarchy. Moreover, it was temporary, did not unnecessarily trammel the interests of white employees, did not require discharge of whites and their replacement with new black hires, and did not create an absolute bar to the advancement of whites since half of those trained would be white.

The Ordinance and Plan before us have a less significant impact on non-minority workers than did the plan in the *Weber* case, and the Union has not suggested that we give section 703(c) a construction different than that given section 703(a).

The Union urges in addition that the Ordinance and Plan violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the provisions of 42 U.S.C. § 1981 and 1983. However, any claim under these sections presupposes a violation of the Equal Protection Clause or Title VII, and the Union has shown no such violation.

■ The Union also contends that the Ordinance and Plan prevent the Union from providing the equal representation to its members required by the National Labor Relations Act, 29 U.S.C. § 158(b). But there is no violation of equal representation where a union complies with a valid affirmative action program.

### VII

Finally the Union asserts that the Ordinance and Plan violate Connecticut constitutional and statutory law. The argument is based on the premise that any affirmative action program is prohibited by (a) Article First, section 20 of the Connecticut Constitution, providing for "equal protection" and against "discrimination" on the ground of religion, race, color, ancestry or national origin, and (b) Connecticut's "Fair Employment Practices" legislation, Chap. 563 Con.Gen.Stat., admittedly intended to be coextensive with Title VII, 42 U.S.C. § 2000e–2.

■ As the District Court observed, the Connecticut courts have held that the equal protection clauses of the Connecticut and United States constitutions have substantially the same meaning. *Snyder v. Town of Newton*, 147 Conn. 374, 381, 161 A.2d 770 (1960). The Union cites no authority to the contrary.

Nor does the Union point to any Connecticut decision suggesting that the Connecticut Fair Employment Practices Act should be construed to have a meaning different from Title VII on which it was modeled.

### VIII

We have considered the Union's other contentions and find them without merit.

The judgment is affirmed.

VAN GRAAFEILAND, Circuit Judge (dissenting):

In January 1977, the Mafco Electric Co. of West Hartford, Connecticut, laid off two of its employees. It discharged them, not because they were incompetent or derelict in their duties, but because they were white males. Had they been Spanish-Americans just immigrated from Cuba, Blacks recently

arrived from Alabama, or white heiresses working for kicks, they would have continued to draw their paychecks. However, they were white males and so they lost their jobs. They were discharged in order that Mafco could comply with an "anti-discrimination" ordinance enacted by the City of Hartford.

Although official 1980 census figures have not yet been established, it is estimated that approximately 50 percent of Hartford's population are non-white and that at least 50 percent are women. This means that approximately 25 percent are white males. The Hartford City Fathers have decided nonetheless that, insofar as the City is concerned, the non-whites and women are the minority group and the white males are the majority group.[1] They enacted an ordinance to ensure "equal employment opportunity" on city projects for the 75 percent of Hartford's citizens making up the "minority" group and to establish "reasonable minimum percentage goals" in the construction industry for that group. Although 15 percent was set as the basic minimum level for "minority" employment, the actual percentage goals are to be determined by the City Manager, using, among other criteria, the size of the qualified "minority" labor force in the Hartford Labor Market Area. Moreover, the adequacy of the goals so established is to be reviewed annually. As this Court proceeds to put its stamp of approval upon this program, it is appropriate, I think, that we pause briefly to take a look at where we are and where we are going.

We conclude, as we must, that affirmative action programs of this sort can no longer be justified as "deferred recompense for past injustices." There can have been no injustices against racial minority members who appeared on the scene no earlier than yesterday or against women whose interest in construction work is not of vintage character. Now, our support assertedly is based upon the desirability of bringing about what the majority describe as the "moral equality of the races." It is not too early—perhaps it is too late—to consider what is meant by "moral equality of the races" and to ask ourselves where the United States women fit into this "moral equality" picture. A look at history may furnish a helpful perspective.

In 1920, Hungary enacted a law known as Law XXV, 1920, which provided among other things that the student bodies in the universities should be proportioned by race so that the percentages corresponded with the racial percentages in the country as a whole.[2] In effect, this law gave Magyar students priority over Jews in admission to universities.[3] In 1941, Bulgaria enacted a Law for the Defense of the Nation (*Zakon za zashtitata na natsiiata,.ZZN*) which limited the number of Jews in both the schools and the outside economic world.[4] Article 25 of the Statute, which limited the number of Jews in various occupations, empowered the Cabinet to decide on the distribution of occupations in the country's professions and trades.[5] In 1887, a law was enacted in Russia limiting the number of Jews in various middle and higher schools to between 2 and 15 percent.[6] In pre-Nazi Germany, Jews were permitted to attend universities and practice certain professions only in proportion to their numbers in the population.[7]

These European laws are well-recognized examples of *numerus clausus* legislation. Translated freely as "limited numbers", *numerus clausus* describes a situation once

**1.** Article X, § 2–323 of the Hartford Code includes within the definition of "minority group persons" Blacks, Puerto Ricans, Spanish-Americans, Orientals, American Indians, and women.

**2.** Vol. 8, *The Universal Jewish Encyclopedia*, 251, 252 (1942).

**3.** P. Grosser & E. Halperin, *The Causes and Effects of Anti-Semitism* 249 (1978).

**4.** F. Chary, *The Bulgarian Jews and the Final Solution, 1940–44* 37–41 (1978).

**5.** *Id.* at 42.

**6.** Vol. 8, *The Universal Jewish Encyclopedia, supra*, at 251.

**7.** *Id.*

prevalent in several European countries in which Jewish participation in schools and occupations was limited by numbers or percentages or by relating Jewish participation to that of other races. It now appears that in cities such as Hartford the white male is about to inherit the role of the European Jew. As the number of Bulgarian Jews self-employed in commerce, credit, and insurance dropped from 4,465 in 1926 to 761 in 1942,[8] so will the number of white males employed in the Hartford construction industry drop if the *numerus clausus* of Hartford's affirmative action program continues in effect.

Moreover, with the adoption of affirmative action plans such as that of the City of Hartford, the day is not far off when *numerus clausus* will be applied not simply to white males but to all races, and to sexes as well. Combining Blacks, Puerto Ricans, Spanish-Americans, Orientals, American Indians, and women into one "minority group" gives substantial statistical support to those who favor affirmative action for minorities. No prescience is needed, however, to predict that the homogeneity of this minority group will not long endure. Blacks will not sit idly by should all affirmative action jobs be given to white women. Spanish-Americans will not remain passive if a disproportionate number of jobs is given to Blacks. They will each demand recognition for their own race as a separate minority group, and the inevitable result will be a *numerus clausus* for all groups. An employer will need a computer to unscramble the conflicting quota demands of race and sex groupings and a lawyer at his right hand to defend him against error.[9]

Men of good will look back with distaste upon the battle over immigration quotas that raged in Congress during the early 1920's. Those quotas, like affirmative action quotas, were concerned with racial balance. Immigration quotas were established to preserve racial balance in the country as a whole;[10] affirmative action quotas are intended to create it in specific areas or occupations. The first immigration quota law, enacted in 1921, limited the number of any immigrating nationality to 3 percent of foreign-born persons of that nationality who lived in the United States in 1910.[11] Prior to the expiration of this law in 1924, Congress set about enacting successor legislation, and a dispute arose as to whether the 1890 census rather than the census of either 1910 or 1920 should be used as a basis for the new 2 percent quota. The Congressmen who wanted to restrict immigration from southern and eastern Europe favored the 1890 census because most immigrants from those areas arrived at a later date. Those who favored immigration from southern and eastern Europe argued for the 1910 or 1920 census.[12] The debate in Congress was acrimonious. Moreover, regardless of the facial arguments used, the fundamental issue was whether the quota of one nationality or another should be favored.[13] It was a dark chapter in our country's history but a chapter that will surely be rewritten if the use of *numerus clausus* or racial quotas in affirmative action programs is not restricted.

Following the enactment of ZZN, Bulgarian Jews received an occupational allotment of 21 doctors, 20 lawyers and 7 dentists.[14] When the day comes that similar allotments are made in this country, those who dream of an integrated society, free from racial controversy and animosity, will long since have had their dreams shattered. My

8. F. Chary, *The Bulgarian Jews and the Final Solution, 1940–44, supra*, at 42 n.14.

9. *See, e. g.*, 29 C.F.R. § 30.4(f); *Jefferies v. Harris County Community Action Assn.*, 615 F.2d 1025 (5th Cir. 1980).

10. *See* Committee on the Judiciary, *The Immigration and Naturalization Systems of the United States*, S.Rep.No. 1515, 81st Cong., 1st Sess. 430, 443 (1950).

11. *Id.* at 56.

12. *Id.* at 60.

13. *Id.* at 60–65.

14. *The Bulgarian Jews and the Final Solution, 1940–44, supra*, at 42.

brothers appear to take comfort in the fact that the present Hartford quota is only 15 percent. Apparently they believe that the "minority" which holds political power in Hartford will be content with that figure. However, that "minority" cannot help but know that, if a 15 percent quota is legal, so also is a 30 percent, a 50 percent, or a 75 percent quota. *See United Steelworkers v. Weber*, 443 U.S. 193, 208–09, 99 S.Ct. 2721, 2730–31, 61 L.Ed.2d 480 (1979). Conceptually, there is no distinction in the figures. The only giant step has now been taken and judicially approved. From 15 percent to 75 percent is simply the continuance of a process already under way, and there is no logical stopping place in between.

The arguments against *numerus clausus* are not answered by saying that the framers of racial quota legislation are well-intentioned. The Inquisition itself was not evilly motivated. "If a religious, moral, or political purpose may exculpate illegal behavior, one might commit bigamy to avoid eternal damnation; steal from the rich to give alms to the poor; burn and destroy, not merely public records or perhaps buildings but even public servants as well, to implement a Utopian design." *United States v. Cullen*, 454 F.2d 386, 392 (7th Cir. 1971) (footnote omitted). It is by well-intentioned processes such as this, rather than by revolution, that individual rights and freedoms in a democracy are most likely to be lost.

The adverse effects of the discharge of the Mafco employees were not limited to the two men and their families. When Mafco laid off the two white male employees, it called upon appellant to replace them with two Blacks. However, the 1965 contract between appellant and Mafco, a copy of which was in the possession of the City since October of that year, provided that employees would be referred in the order in which they registered on an "Out of Work List". Although prior to the demand by Mafco the Union had jumped minorities over whites in order to meet the demands of the Hartford Affirmative Action Plan, the Union discontinued this discriminatory practice upon the advice of its attorney. It

was and is the belief of appellant's counsel that compliance with Mafco's demand would violate 42 U.S.C. § 2000e–2, which makes it unlawful for a labor organization to fail or refuse to refer any individual for employment because of that individual's race, color, religion, sex, or national origin. The Common Council of the City of Hartford has in effect nullified this federal statutory enactment by legislatively declaring that the group constituting 75 percent of Hartford's population is a minority and that there has been discrimination against that minority in the construction industry.

The majority opinion implies that if appellant's membership included 15 percent of the "minority group" instead of 7 percent, the first minority worker would be transposed magically from 85th place to 1st place on the Out of Work List and the second minority worker would be alchemized from 94th place to 2nd place. Thus, no "bumping" or "leapfrogging" would be required in order to meet Mafco's demand for two Blacks. This suggestion is without mathematical support. Even if minorities made up 15 percent of the Out of Work List, the chances would always be about 7 to 1 against one of them being at the top and, if the statistical estimates of the writer's clerk are correct, about 49 to 1 against them *being listed first and second*. Moreover, the record discloses that the electrician whose name was on the bottom of the Out of Work List had to wait one and one-half years before he reached the top. This means that those whose names were at or near the top when Mafco asked for Black replacements were already out of work when the Union certified itself into the Hartford Plan in October 1975. There was no way in which the Union could have furnished Mafco with Black employees without leapfrogging them over white employees who had been waiting 18 months for work. The district court disposed of this problem very simply by holding that leapfrogging would not be "unduly burdensome" on the whites who were bypassed because they would only be delayed in finding employment, not permanently denied it.

The majority wisely avoids comment on this holding.

It would have been better perhaps if the majority had also resorted to less conjecture and surmise in their attempt to mitigate the discriminatory effect of the bumping and leapfrogging, about which this Court long ago expressed its concern. *See United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 659 (2d Cir. 1971). Statements that a union worker would "in all likelihood" not have qualified for Group I, that a job referral bank "evidently" had the names of non-union members, that by addition of non-union workers' names chronological referrals "might well have met the City's goals", and that qualified non-union workers "may well have been out of work" longer than union workers, none of which statements is supported by proof, do not seem quite appropriate in an action in which summary judgment was granted.

When Robert Murray, appellant's Business Manager testified before the Contract Enforcement Committee, the following colloquy took place:

Q: And have you notified all non-Union members of the existence of this list?

A: Oh, they know there is a list. I think the thing is everybody has gone out looking for a job everywhere they can get one.

Q: And what steps have you taken to advise non-union members of the existence of this list?

A: Oh, non-union members know that the list exists. They have come to this Union over the years. The fact is, people in the Union and those that are not members are practically giving up. We have people working for the City of Hartford, people traveling throughout the country. Anybody on the bottom of this list today, he is good for a year and a half.

If the Hartford Affirmative Action Plan is applied to appellant, Mr. Murray will have to amend the last quoted sentence by adding "unless that person is Black, Puerto Rican, Spanish-American, Oriental, American Indian, or a woman."

The Hartford plan is a far step removed from the early affirmative action plans in which we approved the "gingerly" use of quotas for the purpose of remedying the prejudicial effects of past discrimination against a true racial minority. With the addition of women to the so-called "minority group", quota allocations as between the "majority" and the "minority" will leave white males eventually with about a 25 percent allocation. This must be what my colleagues mean by "moral equality of the races."

Justice Mosk, writing for the dissent in *Price v. Civil Service Commission*, 26 Cal.3d 257, 604 P.2d 1365, 161 Cal.Rptr. 475 (1980), has ably summarized why the path along which we are now traveling is leading us in the wrong direction. Although the writer of this dissent could repeat what Justice Mosk has said, he could not improve upon it, and therefore is content to simply express his adherence to Justice Mosk's views. For the good of our country, I hope that Justice Mosk and the writer are wrong. I believe, however, that history will prove us to be right.