Timothy JANOWIAK,
Plaintiff-Appellant,

v.

The CORPORATE CITY OF SOUTH BEND, Board of Public Safety, South Bend Fire Department, Mayor Roger Parent, Timothy Brassell, Fire Chief, Robert Potvin, and Stanley M. Przyblinski, Defendants-Appellees.

No. 84–1321.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1984.

Decided Dec. 6, 1984.

Rehearing and Rehearing En Banc Denied March 11, 1985.

Patrick T. McFadden, McFadden & McFadden, South Bend, Ind., for plaintiff-appellant.

Thomas L. Bodnar, South Bend, Ind., for defendants-appellees.

Before BAUER, Circuit Judge, PELL, Senior Circuit Judge, and DUPREE, Senior District Judge.[*]

PELL, Senior Circuit Judge.

This case presents the question whether the City of South Bend could adopt an affirmative action program for its Police and Fire Departments solely upon the basis of a finding that a disparity existed between the percentage of minorities in the population of South Bend and the percentage of minorities in the Departments. The district court, 576 F.Supp. 1461 (N.D.Ind. 1983) granted summary judgment to defendants-appellees, the City of South Bend and various municipal agencies and officers, holding that the City's statistical comparison justified the implementation of an affirmative action program. On appeal, plaintiff-appellant challenges the court's grant of summary judgment upon the grounds that defendants violated Title VII and the Equal Protection Clause of the Fourteenth Amendment by adopting and implementing an affirmative action program without an adequate finding of past discrimination.

## I. Facts

On June 20, 1979, at a meeting of the South Bend Board of Public Safety, the Board appointed a Task Force to design and implement a plan to improve the recruitment of minorities for the Police and Fire Departments. In particular, the Board noted that the percentage of minorities in the population of South Bend was 14.1% and the percentage of minorities in the Fire Department was approximately 5.3%. At this meeting, the Chairman of the Board, Franklin Morse, stated that he believed that the Board could not institute a preferential hiring system without a finding of past discrimination.

The Minority Recruitment Task Force submitted its report to the Board of Public Safety on January 29, 1980. In its report, the Task Force stressed the fact that although minorities requested 28% of the applications for positions in the Fire Department, only 9% of these applications were returned. By comparison, non-minorities returned their applications at a rate of 37%. Emphasizing that the Board's hiring standards were reasonable, the Task Force advocated the continued use of the standards. In fact, in a preliminary report to the Board of Public Safety, the Chairman of the Task Force stated that the Task Force did not find that the hiring procedures were discriminatory. The Task Force recommended, however, that the Board adopt a modified two-to-one preferential hiring plan to reflect, within five years, the minority composition of the City.

After reviewing the Board's application procedures for the Police and Fire Departments and the report of the Minority Recruitment Task Force, the Minority Re-

[*] Franklin T. Dupree, Jr., Senior District Judge for the Eastern District of North Carolina, is sitting by designation.

cruitment Review Committee presented a written report and recommendation to the Board, which was adopted on June 3, 1980. In its report, the Review Committee also noted the disparity between the percentage of minorities in the Departments and the percentage of minorities in the City and declared, "minority representation on the Police and Fire Department should be consistent with the minority composition of the community." Again, the Review Committee reported that it had reviewed the standards for testing, determined that they were reasonable, and recommended that they be retained. Nonetheless, the Review Committee recommended that the Departments utilize two separate lists to rank those minority and non-minority applicants who achieved a certain base score on the hiring tests. From each list, a three-member panel would recommend to the Board the number of applicants to be hired. The Board of Public Safety adopted these recommendations and, in keeping with the affirmative action program, decided to hire four minority applicants and one non-minority applicant to the Fire Department. The Board appointed these individuals to the Department in November 1980. Although one minority hiree failed the Pension Board physical examination, the Board replaced him with the next applicant on the minority list in February 1981.

Plaintiff in this case, a white male, applied to the Fire Department in July 1980 and completed testing in October 1980. On November 3, 1980, he received a letter from the Board of Public Safety informing him that, among other things, he ranked second out of twenty-two applicants on the non-minority hiring list. At his deposition, plaintiff testified that he could not remember when he learned of the minority hirings, but that, in any event, Mr. Robert Potvin, Assistant to the Board of Public Safety, assured him on at least two occasions prior to February 1981 that the Board would hire him as a firefighter. Sometime in February 1981, Potvin told plaintiff that he would not be hired and denied ever telling plaintiff that he would be hired. Plaintiff filed a charge of race discrimina-

tion with the Equal Employment Opportunity Commission on July 7, 1981, and the Commission issued a right to sue letter on February 18, 1982.

The district court granted defendants' motion for summary judgment on December 29, 1983, and subsequently denied plaintiff's motion to set aside the order granting summary judgment on January 27, 1984. The district court determined that, although the statute of limitations barred plaintiff's EEOC charge because he failed to file it within 180 days of the Board's decision to hire the firefighters, the statute was equitably tolled by Potvin's assurances that plaintiff would be hired. Reaching the merits of defendants' arguments, the district court held that summary judgment should be granted because neither Title VII nor the Fourteenth Amendment prohibited the adoption of an affirmative action program designed to remedy the statistical disparity between the percentage of minorities in the population of the City and the percentage of minorities in the Fire Department.

## II. Analysis

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the Supreme Court, the party seeking summary judgment bears the burden of persuading the court that no issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). *See Herman v. National Broadcasting Co.*, 744 F.2d 604, 607 (7th Cir.1984). In determining whether an issue of material fact exists, the court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment. *Id. See Trulson v. Trane Co.*, 738 F.2d 770, 771 (7th Cir.1984).

### A. Statute of Limitations

Defendants contend that summary judgment is appropriate because the statute of

limitations bars plaintiff's EEOC charge since he did not file it within 180 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e). The district court determined that plaintiff failed to comply with the statute of limitations because the date that triggered the statute was either October 28, 1980, when the Board made its hiring decision, or sometime in November 1980, when the actual hiring occurred. Plaintiff did not file his charge until July 7, 1981, well beyond the 180-day limit under the statute.

█ The district court decided correctly that the statute of limitations began to run when the Board hired four minority candidates and one non-minority candidate to the Fire Department. In *Delaware State College v. Ricks*, the Supreme Court held that the 180-day limit begins to run from " 'the time of the *discriminatory acts*, not … the time at which the *consequences* of the acts bec[o]me most painful.' " 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (emphasis in original) (quoting *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979). Plaintiff's claim that he did not learn of the hiring decision until sometime in the spring of 1981 does not affect the conclusion that plaintiff failed to satisfy the statute of limitations. Of course, the statute may be tolled if, due to circumstances beyond his control, a person does not learn of the facts supporting his charge within the statutory limitations period. *Wolfolk v. Rivera*, 729 F.2d 1114, 1117 (7th Cir.1984). To determine whether a person was prevented from discovering the necessary facts by circumstances beyond his control, the court must inquire "when 'facts that would support a charge of discrimination under Title VII were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.' " *Id.* (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir.1975)). *See Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d

407, 410 (7th Cir.1984); *Coleman v. Clark Oil & Refining Co.*, 568 F.Supp. 1035, 1038–39 (E.D.Wis.1983). Under this objective test, plaintiff should have learned of defendants' hiring actions at some point within the 180-day limit. Plaintiff concedes that prior to the completion of the testing process he received a copy of a memorandum entitled "Hiring Procedure" that set forth many of the details of the affirmative action program. The Board of Public Safety, in its November 3rd letter to plaintiff, referred to plaintiff's number two ranking as his position on the "non-minority hiring roster." Although defendants never informed plaintiff in writing of the Board's hiring decision, the decision was discussed at the Board's public meetings and in the local newspapers. These facts do not warrant a finding that circumstances beyond plaintiff's control prevented him from learning of the hiring decision. At the very least, he should have learned of these facts in February 1981 when Potvin informed him that he would not be hired.

Plaintiff contends that his charge was not time-barred because the discriminatory act—the hiring of four minority applicants and one non-minority applicant—was ongoing until February 1981 when the Board replaced the minority hiree who failed the pension physical with the next applicant from the minority list. The district court rejected plaintiff's theory, finding

> the *discretionary* acts of *selecting* and *hiring* four minority applicants were completed in November, 1980. The act of replacing one of these four minority members with a fifth minority applicant in February of 1981 was a purely ministerial function which did not act to toll the statute of limitations, as it was nothing more than the implementation of the selection and hiring decisions of October 28, 1980.

(emphasis in original). Analogizing plaintiff's ongoing violation theory to a continuing violation theory, this court agrees with the district court that the facts in this case

fail to support plaintiff's theory. Both Robert Potvin, Assistant to the Board of Public Safety, and Charles Roemer, Chairman of the Board, testified at their depositions that the stated policy of the Board mandated replacing an individual who failed to complete training or to pass the physical with an individual from the same list. Mr. Roemer made this policy public at the Board's October 28, 1980, meeting. Thus, the Board's substitution of one individual who failed the physical with another from the same list did not constitute an independent decision but rather constituted a further implementation of its original decision to hire four minority applicants. To hold otherwise would undermine the policy underlying the statutory limitations period. According to the Supreme Court, Congress designed the 180-day limit to "protect employers from the burden of defending claims arising from employment *decisions* that are long past." *Delaware State College v. Ricks*, 449 U.S. 250, 256–57, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980) (emphasis added). *See Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 120 (8th Cir. 1981). In fact, plaintiff challenges as discriminatory in this case the October 28, 1980, hiring decision, not the February 1981 act of replacement.

█ The district court found that the statute of limitations did not bar plaintiff's charge because the statute was equitably tolled until February 1981 by Potvin's assurances to plaintiff that he would be hired. The statute began running again sometime in February 1981 when Potvin informed him that he would not be hired, and plaintiff filed this suit within 180 days after that date. In *Zipes v. Trans World Airlines, Inc.*, the Supreme Court held that the filing requirement "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). *Accord Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 410 (7th Cir.1984); *Li-*

*berles v. County of Cook*, 709 F.2d 1122, 1125 (7th Cir.1983); *Posey v. Skyline Corp.*, 702 F.2d 102, 104 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 392, 78 L.Ed.2d 336. To defeat a motion for summary judgment alleging that the statute of limitations operates to bar the suit, the party opposing the motion must demonstrate the existence of a disputed material fact that presents a genuine issue for trial. *Posey*, 702 F.2d at 105. Construing the facts most favorably to plaintiff, this court holds that plaintiff's claim that Potvin assured him that he would be hired raises the question whether the statute was equitably tolled. Because this question merits a trial, the district court correctly determined that summary judgment should not have been granted on the statute of limitations issue.

## B. The Affirmative Action Program

█ According to the Supreme Court, employers may adopt affirmative action programs to remedy past discrimination. *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Race-conscious programs do not, as a matter of law, violate either Title VII or the Equal Protection Clause of the Fourteenth Amendment. They must, however, be based upon findings of past discrimination by a competent body. *Fullilove v. Klutznick*, 448 U.S. 448, 498, 100 S.Ct. 2758, 2784, 65 L.Ed.2d 902 (1980) (Powell, J., concurring); *Bratton v. City of Detroit*, 704 F.2d 878, 886 (6th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). This court agrees with the district court that the Board of Public Safety is a body competent to make findings of past discrimination and to implement an affirmative action program because the Board is the "administrative body legally responsible for the operation of the South Bend Fire Department." Ind.Code Ann. § 36–8–3–2 (West 1983) (re-

placing Ind.Code Ann. § 18–1–11–1 (Burns 1974).

## 1. Title VII

In *United Steelworkers of America v. Weber,* the Supreme Court provided guidelines to analyze the validity of an affirmative action plan under Title VII. 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Court there sustained a plan against a Title VII challenge finding that the plan was "designed to break down old patterns of racial segregation and hierarchy" and did not "unnecessarily trammel the interests of the white employees." *Id.* at 208, 99 S.Ct. at 2729. In *Weber,* the Court held that Title VII permitted an employer to implement a collectively bargained affirmative action program that required the employer to admit 50% black employees into its craft training program until the percentage of black craftworkers mirrored the percentage of blacks in the labor force. In upholding the plan, the Court relied upon more than the glaring statistical disparity between the percentage of black craftworkers employed and the percentage of blacks in the workforce. *Id.* at 198–99, 99 S.Ct. at 2724–25. In fact, the Court took judicial notice of the craft unions' history of excluding blacks from membership. *Id.* at 198 n. 1, 99 S.Ct. at 2725 n. 1. *See Local 35, International Brotherhood of Electrical Workers v. City of Hartford,* 625 F.2d 416, 422 (2d Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). Declining to promulgate a general test to distinguish between permissible and impermissible affirmative action plans under Title VII, the Court emphasized that the legality of the affirmative action plan under Title VII rested upon a finding of "conspicuous racial imbalance in *traditionally segregated job categories.*" 443 U.S. at 209, 99 S.Ct. at 2730 (emphasis added).

■ Because an affirmative action program must be based upon a finding of past discrimination, this court must determine whether the statistical disparity at issue in this case constitutes a finding of past discrimination. This court concludes that an employer must proffer something more than a finding of a statistical disparity between the percentage of minorities employed and the percentage of minorities within the community to justify the adoption of an affirmative action program. As discussed previously, the Supreme Court's only decision addressing the issue of the validity of an affirmative action plan under Title VII hinged on the Court's finding of purposeful exclusion of blacks from the craft unions. *Weber,* 443 U.S. 193, 99 S.Ct. 2721. *See Local 35, International Brotherhood of Electrical Workers v. City of Hartford,* 625 F.2d at 422 (judicial findings of a history of racial discrimination in the construction trades). In a somewhat similar case to this case, the Sixth Circuit acknowledged that statistical data demonstrating an underrepresentation of blacks in the Detroit Police Department constituted evidence of discrimination. *Detroit Police Officers' Association v. Young,* 608 F.2d 671, 687 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). The court, however, premised its decision that the affirmative action program was permissible under Title VII on the presence of other indicia of past discrimination. The court noted that black police officers testified that the Department had customarily discriminated against them while they were on the force, that some evidence suggested that the entry level examinations discriminated against blacks, and that the Department's background investigation procedures created opportunities for discrimination against blacks. *Id.* at 687, 690.

In the present case, the Board of Public Safety based its finding of past discrimination only upon the statistical disparity between the percentage of minorities in the Fire Department and the percentage of minorities within the population of South Bend. In fact, the Task Force found that the hiring standards were reasonable and should be retained. At a meeting of the Board of Public Safety, the Chairman of

the Task Force stated that the past hiring practices were not discriminatory. The courts that have examined the question whether statistical data suffices to prove past discrimination do not agree on a consistent approach to the issue, although most courts would seem to require additional evidence. *See, e.g., Bratton*, 704 F.2d 878; *Local 35, International Brotherhood of Electrical Workers*, 625 F.2d 416; *Detroit Police Officers' Association*, 608 F.2d 671. In any event, under *Weber* and this court's previous decision in *Lehman v. Yellow Freight System, Inc.*, 651 F.2d 520 (7th Cir.1981), in which this court stated that statistical data constitutes "the *first step* in assessing whether [an] employer decides properly to institute an affirmative action plan," *id.* at 527 (emphasis added), the district court improperly disposed of the matter on a motion for summary judgment. The court should not have concluded, as a matter of law, that defendants did not violate Title VII by adopting an affirmative action program in response to a finding of past discrimination based solely upon a statistical disparity.

**2. Fourteenth Amendment**

Although generally the court should not reach a constitutional question if it can dispose of the case on other grounds, this court departs from that approach in this case. Virtually all of the courts that have addressed both Title VII and Equal Protection challenges to affirmative action plans have analyzed both issues. *See, e.g., Bratton*, 704 F.2d 878; *Local 35, International Brotherhood of Electrical Workers*, 625 F.2d 416. The courts have analyzed both the Title VII and Fourteenth Amendment issues similarly, prompting one court to declare that if a plan passes muster under the more exacting constitutional inquiry, it necessarily withstands challenge under Title VII. *Bratton*, 704 F.2d 878. This court reaches the merits of plaintiff's Equal Protection claim because the Equal Protection Clause lends even greater support to our decision that the trial court improperly

granted summary judgment than does Title VII.

The Supreme Court has not yet articulated the standard of review that applies to racial classifications contained in affirmative action programs. The Court's plurality decisions in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), demonstrate that the Court is divided over the question whether the same standard of review applies both to racial classifications built into affirmative action programs and to racial classifications built into other contexts. After reviewing the eleven separate opinions filed in these two plurality decisions, this court agrees with the Sixth Circuit that "the only clear consensus to be garnered from these various statements is that in any affirmative action program (1) some governmental interest must be served, and (2) the program must somehow be directed toward the achievement of that objective." *Bratton v. City of Detroit*, 704 F.2d at 885.

Although the Court in *Bakke* struck down the University's use of quotas to redress societal discrimination suffered by blacks, five of the Justices acknowledged that the government possesses a substantial and important interest in remedying identified discrimination. 438 U.S. at 307, 362, 98 S.Ct. at 2757, 2784 (Powell, J., opinion) (Brennan, J., White, J., Marshall, J., Blackmun, J., dissenting). *See also Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Burger, C.J., opinion). As with a Title VII challenge, in a case brought under the Fourteenth Amendment, the government must demonstrate that its remedial program responds to a finding of past discrimination. Absent a finding of past discrimination, the government cannot satisfy the first prong of the constitutional test that requires it to articulate a substantial or important governmental interest underlying the affirma-

tive action plan. The Eighth Circuit discussed the reason why the government must make findings. of past discrimination before it constitutionally can adopt an affirmative action program:

> Absent findings of past discrimination, courts cannot ascertain that the purpose of the affirmative action program is legitimate. Such findings enable courts to ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action.

*Valentine v. Smith*, 654 F.2d 503, 508 (8th Cir.1981), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

■ Once again, to resolve the question whether defendants have demonstrated an important or substantial interest underlying the affirmative action program, this court must decide whether statistical data constitutes a finding of past discrimination. Under the more exacting constitutional standard, this court now holds that evidence of statistical disparity alone fails to prove past discrimination and cannot justify the adoption of a remedial plan that may discriminate against non-minorities. Even the four dissenters in *Bakke* seem to agree that the government needs to proffer something more than statistical evidence of a disparity between the percentage of minorities employed and the percentage of minorities in the population to prove past discrimination:

> [A] state government may adopt race-conscious programs if the purpose of such programs is to remove the disparate racial impact its actions might otherwise have *and if there is reason to believe that the disparate impact is itself the product of past discrimination,* whether its own or that of society at large.

438 U.S. at 369, 98 S.Ct. at 2788 (Brennan, J., dissenting) (emphasis added). Defendants failure to put forward any evidence other than evidence of statistical disparity and their own admissions that the hiring practices appeared reasonable and non-discriminatory persuade this court that they have failed to show the necessary finding of discrimination.

Of course, evidence of a statistical disparity between the percentage of minorities employed and the percentage of minorities in the general population could, given the presence of additional evidence, demonstrate the existence of past discrimination. For example, the Sixth Circuit in *Bratton v. City of Detroit* upheld the Detroit Police Department's affirmative action program against a challenge that the Department had failed to make a finding of past discrimination. 704 F.2d at 887. The court considered the statistical data that the City offered and decided that, taken together with other evidence, the statistics demonstrated that the Department had practiced intentional discrimination. *Id.* at 889. The other evidence of intentional discrimination consisted of evidence and testimony relating to "[n]umerous instances of discriminatory practices in hiring, promotion, the ability to transfer from a patrol position to a plain clothes one and the day-to-day treatment of black officers." *Id.*

In this case, the district court decided incorrectly that evidence of a statistical disparity between the percentage of minorities employed in the Department and the percentage of minorities within the population of South Bend constituted, without more, a finding of past discrimination. Accordingly, the district court's grant of summary judgment is REVERSED, and this case is REMANDED to the district judge from which this appeal was taken for further proceedings consistent with this opinion.