ietta Suttles. Therefore, the judgment of the district court is

AFFIRMED.

Elmer BRITTON, et al.,
Plaintiffs-Appellants,

v.

SOUTH BEND COMMUNITY SCHOOL
CORPORATION, et al.,
Defendants-Appellees.

No. 84–2841.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1985.

Reargued En Banc Oct. 23, 1986.

Decided May 18, 1987.

---

Michael A. Carvin, Edwardsburg, Mich., Richard J. LaSalvia, South Bend, Ind., for plaintiffs-appellants.

Franklin A. Morse, III, Barnes & Thornburg, South Bend, Ind., for defendants-appellees.

Before BAUER, Chief Judge, CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

In 1982 the public school system of South Bend, Indiana laid off 146 teachers. All were white; 48 had more seniority than blacks not laid off; two years later 20 of the 48 had not yet been recalled. In laying off only whites, the school board was acting pursuant to a provision in its collective bargaining agreement with the teachers' union to the effect that no blacks would be laid off until every white was laid off. The laid-off teachers sued the school system under section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, charging that the racially preferential layoff provision violated the equal protection clause of the Fourteenth Amendment, and seeking reinstatement and damages. The district court, after a bench trial, gave judgment for the board. 593 F.Supp. 1223 (N.D.Ind.1984). The court thought the board's adoption of the provision a reasonable means toward the board's goal, which the court also thought reasonable, of raising the percentage of black teachers in the South Bend school system to that of black students. The board had resolved "to increase the percentage of minorities [meaning blacks] in its teaching force until that percentage equals the percentage of minorities in its student body. The Board specifically resolved to increase the percentage of minority pupils [*sic* —the judge meant 'teachers'] because it deemed it essential that the student population, both black and white, have a sufficient number of minority teachers to act as role models." *Id.* at 1225. "In cases dealing with school corporations, it is proper to compare the percentage of minority faculty with the percentage of minorities in the student body rather than with the percentage of minorities in the relevant labor pool ... because of the vital role teachers play as role-models for their students. This is particularly true in the rise [*sic* —the judge apparently meant 'case'] of minority teachers since 'societal discrimination has often deprived minority children of other role models.' " *Id.* at 1230 n. 3.

The plaintiffs appealed. A divided panel of this court affirmed. 775 F.2d 794 (7th Cir.1985). The full court then granted rehearing en banc. Before the case could be reargued, the Supreme Court decided a similar case in favor of another group of white public school teachers. *Wygant v.*

*Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Like the panel in the present case, the Sixth Circuit had upheld the dismissal of the complaint. The Supreme Court reversed. It rejected the "role models" rationale on which the Sixth Circuit, like the district court in the present case, had based its decision. The Supreme Court did not remand for further proceedings to determine whether the plaintiffs' constitutional rights had been violated; it held they had been. When the present case was reargued to us, the question no longer was reversal or affirmance; it was whether to reverse outright, holding that the plaintiffs had proved a violation of their constitutional rights and remanding only for the determination of the appropriate remedy; or to remand for further proceedings in which the board would have an opportunity to establish a rationale for racially discriminatory layoffs that would be consistent with the *Wygant* decision.

The constitutional status of discrimination by public bodies in favor of blacks and other members of minority groups is contentious and unsettled; but with the Supreme Court having spoken so recently to a set of facts so close to those of the present case, the task for us is the interpretation of the Court's decision rather than the forging of new constitutional law. *Wygant* came out of the public school system of Jackson, Michigan. In 1968, the year before the Jackson board of education adopted a racially preferential hiring plan, 4 percent of the city's public school teachers were black, compared to 15 percent of the students. *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1156 (6th Cir.1984), rev'd, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Because Michigan's civil rights commission believed that the disparity was due to discrimination against black teachers (see 106 S.Ct. at 1854), the board of education agreed to give preference in hiring to blacks until the percentage of black teachers was equal to that of black students. By 1971, 9 percent of the teachers were black. 746 F.2d at 1156. That year it became necessary to lay off some teachers. The board did this in the usual way—reverse order of seniority. A disproportionate number of those laid off were black, because so many blacks had been hired recently and therefore had little seniority. The racial situation in the Jackson public schools soon became even more tense—became, indeed, violent. See 106 S.Ct. at 1859. Expecting that additional layoffs would be necessary in the near future, the board decided it must take measures to make sure that such layoffs would not reduce the number of black teachers disproportionately. The board felt it needed to have as many black teachers as possible in order to quiet the schools and give black students role models. It also feared that the hiring of blacks would be impeded by strict adherence to the principle of laying off teachers in reverse order of seniority, because new teachers would know they would be the first to be laid off if there was a reduction in force.

In 1972 the board negotiated with the teachers' union an agreement (which became Article XII of the collective bargaining contract with the union) to deviate from the principle of laying off teachers in reverse order of seniority, but only to the extent necessary to preserve the existing percentage of blacks (and other members of minority groups, but we can ignore that feature of the case) in the teaching force. So if 10 percent of the teachers were black, no more than 10 percent of the teachers laid off could be black.

The collective bargaining contract in *Wygant* was ratified by an overwhelming majority of the Jackson public school teachers, most of whom were white. Nevertheless, in a suit by white teachers laid off because of Article XII, the Supreme Court held that the provision was a denial of equal protection. Although there was no majority opinion in *Wygant,* a "lowest common denominator" majority position can be pieced together. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v.*

*United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

Justice Powell, writing in *Wygant* for three Justices, opined that a public body may not use race as a criterion for layoffs unless necessary to protect a proven victim of discrimination, such as a black who if he had not been discriminated against would have had as much seniority as a white. See 106 S.Ct. at 1849–52. Justice White took the same position, only more bluntly. See *id.* at 1857–58. Obviously if either of those opinions had commanded a majority, we would have to reverse outright. But since Justice O'Connor, the fifth and last member of the majority, concurred in the judgment of reversal on the narrowest ground, her opinion is critical to our determining the proper disposition of the present case.

She reserved the question whether a racially preferential layoff plan might ever be a constitutionally permissible measure "to correct apparent prior employment discrimination against minorities while avoiding further litigation," *id.* at 1854 (see also *id.* at 1857), and she noted in this connection that the Jackson school board had "reasoned that without the layoff provision, the remedial gains made under the ongoing hiring goals contained in the collective bargaining agreement could be eviscerated by layoffs," *id.* at 1854. The fact that there had been no authoritative determination of hiring discrimination and that the layoff provision would not merely benefit victims of such discrimination did not in her view automatically condemn the plan. Nevertheless she agreed that the plan was unconstitutional and that outright reversal was the proper disposition of the appeal, because the plaintiffs had

> met their burden of establishing that this layoff provision is not "narrowly tailored" to achieve its asserted remedial purpose by demonstrating that the provision is keyed to a hiring goal that itself has no relation to the remedying of employment discrimination.

*Id.* at 1857. That is,

> the hiring goal that the layoff provision was designed to safeguard was tied to

the percentage of minority students in the school district, not to the percentage of qualified minority teachers within the relevant labor pool. The disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination.... Because the layoff provision here acts to maintain levels of minority hiring that have no relation to remedying employment discrimination, it cannot be adjudged "narrowly tailored" to effectuate its asserted remedial purpose.

*Id.* (citation omitted). The hiring goal in the present case was likewise "tied to the percentage of minority students in the school district."

Justice Marshall, the author of the principal dissenting opinion in *Wygant* (which Justices Brennan and Blackmun joined), made two points that are particularly relevant to the present case. First, he noted that an alternative to a racially proportional layoff provision—such as Article XII, which merely preserved the percentage of black teachers achieved before the layoffs —"would have been a freeze on layoffs of minority teachers. This measure ... would have been substantially more burdensome than Article XII, not only by necessitating the layoff of a greater number of white teachers, but also by erecting an absolute distinction between the races, one to be benefited and one to be burdened, in a way that Article XII avoids." *Id.* at 1865. That hypothetical "substantially more burdensome" measure is the one the South Bend school board adopted.

Second, Justice Marshall took exception to the majority's refusal to remand the case for findings on possible justifications for Article XII other than those the majority had rejected. The district court had granted summary judgment for the Jackson board of education because the court found, on the basis of evidence that a much higher percentage of students than of faculty was black, that favoring blacks in layoffs was necessary both to give black students adequate "role models" and to rectify "societal discrimination" against black

teachers ("societal discrimination" meaning a racial imbalance not caused by the defendants' own discriminatory acts). The defendants in *Wygant*, perhaps foreseeing rejection of these grounds, submitted evidence relevant to other possible justifications to the Supreme Court. The submission had no standing as evidence, but it provided a reason for remanding the case to give the lower courts a chance to consider it. The rejection of Justice Marshall's suggestion that the case be remanded has implications for the present case, which the defendants have asked us to remand.

South Bend, Indiana, like Jackson, Michigan, had a lower percentage of black teachers in its public schools than of black students. In 1978, on the eve of adopting a racially preferential hiring plan, the percentages were 10 and 22. Although the 10 percent figure is more than twice the percentage of black teachers in the Jackson public schools at the corresponding period in the evolution of its program of racial preferences, the South Bend school board was not satisfied, and resolved to raise the percentage of black teachers until it equaled that of black students. The layoff plan ensured that if layoffs were necessary they would not impede achievement of the board's goal of racial parity between teachers and students. Indeed, since no blacks could be laid off if any whites had not yet been laid off, the layoff plan (unlike the one in *Wygant*) was calculated to increase rather than just maintain the percentage of black teachers in the event that any layoffs became necessary. By 1981, 13 percent of the teachers (and 25 percent of the students) were black. As a result of the layoff provision, the percentage of black teachers rose—to 14 percent—when it became necessary to lay off teachers, since all of those laid off were white.

No one doubts that the signatories of the plurality opinion in *Wygant*, plus Justice White (a total of four Justices), would invalidate South Bend's racially preferential layoff plan. The plan goes further than the one struck down in *Wygant*; unlike *Wygant* there is no background of racial violence; as in *Wygant* there is no evidence that any of the black teachers who have

benefited from the plan are victims of racial discrimination that deprived them of seniority they would otherwise have had. Conceivably Justice O'Connor might approve a racially preferential layoff plan of some sort (a critical qualification, as we shall see) if she were convinced that the purpose of the plan was to correct previous hiring discrimination by the school board. There was some evidence in the record before the Supreme Court in *Wygant* that that had been the Jackson school board's purpose; there is very little evidence that it was the South Bend board's purpose. The goal advanced by the board in the district court—the goal to which all of the board's evidence was oriented—was to correct a discrepancy between the percentage of black teachers and the percentage of black students. Such a discrepancy is, in Justice O'Connor's view, "not probative of *employment* discrimination," 106 S.Ct. at 1857 (emphasis added), and therefore cannot, in her view, justify racially discriminatory layoffs. For her the proper comparison in deciding whether black teachers have been discriminated against is not between the percentage of black teachers and the percentage of black students but between the percentage of qualified black teaching applicants who are hired and the percentage of qualified white applicants who are hired; if 10 percent of the qualified blacks are hired but 20 percent of the qualified whites are hired, this would be evidence of racial discrimination in hiring. See *id.*; *J. Edinger & Son, Inc. v. City of Louisville*, 802 F.2d 213, 216 (6th Cir.1986). Nowhere in the transcript of the trial or in the trial exhibits do we find evidence that the purpose of the South Bend school board in seeking to equate the fraction of black teachers to the fraction of black students was to remedy employment discrimination. The district court did not overlook this theory of the defense; the theory simply was not presented to the court. Cf. 593 F.Supp. at 1231. The board put all its forensic eggs in the baskets labeled "role models" and "racial imbalance." The board's counsel said at trial, "statistical disparity, that's all that's necessary.... So our evidence,

Your Honor, in terms of justifying this provision, is going to be that of showing the statistical disparage [sic] between the proportion of Blacks in the teaching force of the corporation, and the proportion of [black] students in the student body."

The record contains some evidence bearing on discrimination against blacks, but because discrimination was not the focus of the district court proceedings, the evidence is sparse, and it is also ambivalent. Far from discriminating against black *teachers,* the South Bend school board had for years been hiring a much higher fraction of black than of white teaching applicants. As early as 1972—eight years before the collective bargaining provision challenged in this case—22 percent of all the new hires were black. In 1974 this figure was 30 percent; in 1980, 55 percent. Granted, this is not the complete picture. In 1975, five years before the layoff provision at issue in this case was adopted, HEW wrote a letter to the school board alleging racial discrimination in the South Bend public school system. However, the only concern expressed in the letter with respect to discrimination *in hiring* involved the discrepancy between the fraction of black students and the fraction of black teachers—the theory of discrimination discredited by *Wygant.* And the school board's reply to the letter detailed the board's vigorous efforts to recruit black teachers, efforts that included not only soliciting teaching applications from black colleges but also hiring a much higher fraction of black than of white applicants. A second letter that HEW wrote in 1975 is silent on discrimination in hiring, and a third is a form letter apparently written to all public school superintendents in the country. The record also contains an unsworn, unsubstantiated, unelaborated charge by a member of the audience at a public meeting unrelated to this case that the board had unjustly refused to hire five (unnamed) black teaching applicants. Even if this accusation were accepted as true, it would imply—in the context of uncontradicted evidence that blacks were favored in hiring, consistently with the board's goal of raising the percentage of black teachers to the percentage of black students—a mis-taken personnel decision rather than an act of deliberate discrimination. Finally, *Brown v. Weinberger,* 417 F.Supp. 1215, 1221 (D.C.Cir.1976), noted that HEW had years ago accused the South Bend board of some unspecified form of racial discrimination, but the opinion does not suggest that the accusation is true, or concerned discrimination in hiring. And HEW never did bring suit.

South Bend may have engaged in a different form of discrimination—assigning black teachers to teach black students—for which the proper remedy would be to enjoin this practice, as a consent order did in 1980. The order said nothing about giving blacks superseniority, for that would not be a logical remedy for discrimination in assigning teachers. That Indiana had a segregated school system almost 40 years ago is another fact that pertains to discrimination in assigning, not in hiring, teachers. Steering black teachers to black schools could actually lead to hiring more black teachers than if there were no steering, by earmarking all teaching slots in black schools for blacks. Granted, in 1964 only 4 percent of the teachers in the South Bend public school system were black, yet there is no evidence that this was due to discrimination in hiring or assigning; the percentage of blacks in South Bend was also lower then.

Given the long history of discrimination against black people, in Indiana as elsewhere, we cannot exclude the possibility that the South Bend school board, perhaps until fairly recently, discriminated against black teachers in hiring and that the layoff provision challenged in this case was adopted, in part at least, to correct that discrimination by protecting newly hired black teachers against being laid off in the event of an economic downturn. One would think, however, that if this were so, the board would have argued the point in the district court; for while *Wygant,* decided later, withdrew certain justifications for such provisions, it did not create a new one (correcting previous discrimination). The board had every incentive to assert all its possible defenses in the district court; any

not asserted would ordinarily be deemed waived. See, e.g., *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 360–61 (7th Cir.1987); *Benzies v. Illinois Dept. of Mental Health & Developmental Disabilities*, 810 F.2d 146, 149 (7th Cir.1987). The Supreme Court did not remand *Wygant*, as Justice Marshall had suggested it do, to permit the Jackson board of education to prove that its layoff provision had been designed to rectify previous discrimination in hiring—of which the board had in fact been accused.

Despite all this it might be arguable as an original matter that the evidence of remedial purpose, although weak, is stronger than in *Wygant* and that the South Bend school board should have a chance to shore up that evidence on remand—were it not for Justice O'Connor's insistence that even a remedial layoff plan be "narrowly tailored," a requirement that the plan in this case flunks even more decisively than the plan in *Wygant*. Recall that Justice O'Connor was willing to accept the possibility that the layoff plan had been adopted in order to correct the Jackson school board's "apparent prior discrimination." But that wasn't good enough; the plan was invalid because tied to an improper hiring goal, that of equating the fraction of black teachers to the fraction of black students. The plan in the present case is tied to the same goal, and really no more need be said to condemn the plan. But there is more: enough more, indeed, that even Justice Marshall and the two Justices who joined him might think South Bend had gone too far, by erecting an *absolute* racial preference for blacks. That goes further than necessary to preserve blacks' gains in times of economic downturn, and further than the proportional preference struck down in *Wygant*.

Between 1979 and 1981 the South Bend school board hired 62 blacks, and it was the 48 most recently hired of these blacks, 41 of whom had been hired since 1980, who would have been laid off under a racially neutral layoff plan. Thus, no matter how recently hired a black was, he was placed on the seniority ladder above every white teacher. In addition to giving every black an absolute preference over every white, the plan ties the percentage of black teachers to such irrelevant and unpredictable circumstances as the economic health and school-age population of South Bend; the plan uses economic downturns and shrinkages in the student population as fulcrums for arbitrarily increasing the percentage of black teachers in the public school system. A plan with such effects cannot be held to be "narrowly tailored" to the goal of remedying previous discrimination, even if that was the board's goal, of which there is, as we have said, almost no evidence in the record, and even if such a goal could save a layoff plan tied to a hiring goal of equating the percentage of black teachers to the percentage of black students, which Justice O'Connor (and *a fortiori* the other four Justices in the majority in *Wygant*) believed it could not.

The school board has argued (though not until reargument en banc was granted) that it didn't *really* lay off these whites, because it offered them substitute positions, though at reduced compensation. But the board's counsel acknowledged at argument that his client would have violated the equal protection clause if it had tried to solve its financial problems by cutting just white teachers' wages or fringe benefits (estimated to be worth between $2,000 and $4,000 a year), without laying off anybody. Yet that is what he says the board actually did, by offering to hire the laid-off whites as substitute teachers at a reduced level of compensation.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

FLAUM, Circuit Judge, joined by BAUER, Chief Judge, concurring in the judgment and concurring in part.

I.

I join with Judge Posner in concluding that the plan adopted by the South Bend School Board was not narrowly tailored because it created an absolute preference

for black teachers and thereby imposed a burden on white teachers that was greater than necessary to achieve even the most compelling purpose. I therefore agree that, in light of *Wygant*, the Board's plan fails the test of strict scrutiny and must be held unconstitutional. However, I write separately to express my understanding of the standards that govern our consideration of the constitutionality of affirmative action plans adopted by public employers. I also write separately to offer guidance to the district court, which on remand must determine the relief to which each plaintiff is entitled.

In light of *Wygant*, it is clear that a court may only uphold an affirmative action plan that is adopted by a public employer, and challenged under the Equal Protection Clause, if the court first determines that the employer adopted the plan to achieve a "compelling purpose." Remedying its own past discrimination is indisputably one such purpose.[1] This does not mean, however, that a court may only uphold an affirmative action plan intended to remedy past discrimination if it determines that the public employer actually discriminated. Rather, the critical inquiry is whether the employer, giving due consideration to the rights of all employees, had "a firm basis for determining that affirmative action [was] warranted," *Wygant*, 106 S.Ct. at 1856 (O'Connor, J., concurring in part), and whether it acted based on that belief. In resolving this issue, a court may consider both direct and circumstantial evidence.

At trial, the South Bend School Board, relying on the Sixth Circuit's opinion in *Wygant*, stressed the "role model" theory. As a result, the record on appeal is necessarily incomplete as to the Board's reason for adopting the plan. Nonetheless, the record indicates that the Board maintained a dual school system; received letters from government agencies suggesting that it had discriminated; heard statements made at public meetings accusing it of discrimi-

nation; and signed a consent decree barring racial "steering" of teachers. Although these facts do not conclusively establish that the Board discriminated against black teachers in hiring, they are sufficient to permit a court to conclude that the Board reasonably believed that it had discriminated. The record also indicates that, although the School Board stressed the role model theory, it did suggest at trial that it had adopted the layoff plan to remedy its past discrimination. *See, e.g.,* Trial Transcript 91–92, 95–96 (testimony of former board member H. Hughes).

Although the Board appears to have had a compelling purpose, its plan must fail because it was not narrowly tailored. If the Board had sought to remedy its past discrimination by maintaining the percentage of black teachers, it could have adopted a proportional layoff plan. Such a plan might have been constitutionally permissible in this case. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583, 104 S.Ct. 2576, 2590, 81 L.Ed.2d 483 (1984) (leaving open the question of whether a public employer may voluntarily adopt a proportional layoff plan); *see also Franks v. Bowman Transportation Company*, 424 U.S. 747, 778–79, 96 S.Ct. 1251, 1270–71, 47 L.Ed.2d 444 (1976) (A collective bargaining agreement may "enhanc[e] the seniority status of certain employees ... to the end of ameliorating the effects of past racial discrimination."). If the Board had reasonably believed that the only means to remedy its past discrimination was by continuing to increase the percentage of black teachers, it could conceivably have been permissible for it to adopt a disproportional layoff plan. *Cf. United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (disproportional hiring plan permissible to remedy extreme discrimination by a state actor). The fatal flaw in the Board's plan is that it placed the *entire* burden on the white teachers.

---

1. Remedying past discrimination is not necessarily the only government purpose sufficiently compelling to justify the remedial use of race. Providing faculty diversity may be a second. *Wygant*, 106 S.Ct. at 1853 (O'Connor, J., concurring in part). There may be "other governmental interests ... [that are] sufficiently 'important' or 'compelling' to sustain the use of affirmative action policies." *Id.*

## II.

On remand, the district court must make an individualized assessment of the compensatory and equitable relief to which each plaintiff is entitled. The court should grant compensatory relief only for those injuries that would not have occurred but for the Board's unconstitutional action. For example, those plaintiffs who would have been laid off even if the Board had used its pre-existing seniority system do not appear to have suffered a compensable injury. Moreover, any award of compensatory relief should reflect the mitigation of damages resulting from the substitute teaching and recall provisions.

In determining the equitable relief to which the plaintiffs are entitled, I believe that the district court should be guided by the existing case law concerning "compensatory seniority." The Supreme Court has stated that the "remedial interest of the discriminatees" must be balanced against "the legitimate expectations of other employees innocent of any wrongdoing." *Teamsters v. United States*, 431 U.S. 324, 371–77, 97 S.Ct. 1843, 1872–75, 52 L.Ed.2d 396 (1977). In particular, the Court has indicated that those plaintiffs who have not been recalled are "not automatically entitled to have [an incumbent] employee laid off to make room" for them. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 579, 104 S.Ct. 2576, 2588, 81 L.Ed.2d 483 (1984).

## III.

The outcome in this case should not be construed as a retreat from our belief that the eradication of racial barriers must remain one of the highest priorities of our society, and our recognition that when these barriers are the result of intentional discrimination by a state actor, the Constitution elevates this priority to the status of an affirmative command. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Although we have rejected the plan at issue, our result does not signal any hesitation to uphold reasonable affirmative action programs, even if "innocent persons

[are] called upon to bear some of the burden of the remedy," *Wygant v. Jackson Board of Education*, — U.S. —, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (plurality). Our efforts as a society to remedy the appalling legacy of discrimination are far from finished.

CUMMINGS, Circuit Judge, with whom Judges WOOD, Jr., CUDAHY, and FAIRCHILD join, dissenting.

While fully joining Judge Cudahy's dissent, I feel it is necessary to voice my objection to the grounds relied upon by the plurality and concurrence. "It is now well established that government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination." *United States v. Paradise*, — U.S. —, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (plurality opinion); *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, — U.S. —, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 (plurality opinion). Also beyond dispute is the importance of voluntary efforts on the part of public employers, as well as private employers, to eliminate the lingering effects of racial discrimination, even those effects not attributable to the entity's own practices. *Johnson v. Transportation Agency*, — U.S. —, 107 S.Ct. 1442, 1456–57, 94 L.Ed.2d 615; *United Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480. This concern rises to the level of a constitutional duty to take affirmative action when the lingering discriminatory effects are due to a public employer's own past discrimination. *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 1856, 90 L.Ed.2d 260 (O'Connor, J., concurring); *Keyes v. School District No. 1*, 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548; *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554; *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716. Today's treatment of the layoff plan of the South Bend Community School Corporation (the

"School Corporation") will unjustifiably discourage public employers from voluntarily meeting their constitutional obligations to undertake race-conscious remedial measures.

Public employers who undertake race-conscious remedial measures must consider the need for the measures as well as their effects on the rights of employees innocent of discriminatory wrongdoing. Although a majority of the Supreme Court has yet to reach agreement on the standard for reviewing an equal protection challenge to a public employer's affirmative action program, if that plan meets the requirements of strict scrutiny then there can be no doubts as to its constitutionality. *Paradise*, 107 S.Ct. at 1064. Because we cannot determine on the basis of the record before us that as a matter of law plaintiffs have met their burden of establishing that the School Corporation's layoff provision violated the Equal Protection Clause, even giving them the benefit of the strictest standard for reviewing such plans, this case should be remanded to the district court for further fact-finding.

The evidence and testimony presented at trial and laid out in Judge Cudahy's dissenting opinion herein show that the School Corporation had a "firm basis" for believing that race-conscious remedial measures were necessary. See *Wygant*, 106 S.Ct. at 1856 (O'Connor, J., concurring). The layoff provision was adopted in 1980 after more than a decade of increasing criticism of the School Corporation's policies and practices that maintained a dual school system—officially prescribed by Indiana law until 1949—in which some schools could be identified as "white" or "black." In 1967, the School Corporation was forced by a lawsuit to abandon plans to construct a new school on the site of a school that was 99% black and alleged to be a product of *de jure* segregation. Def. Ex. M–6. There was evidence that black teachers were assigned to predominantly black schools, which received less maintenance and substantially less financial support, and that black teachers had little opportunity for promotion. *Id.* In 1975, the Office for Civil Rights of the Department of Health, Education and Welfare determined that the School Corporation was intentionally segregating faculty members. Def. Ex. M–3. This finding alone creates a *prima facie* case of a violation of the Equal Protection Clause justifying race-conscious remedies, *Swann*, 402 U.S. at 18, 91 S.Ct. at 1277, but there was even more. In the mid–1970's the Board of Trustees of the School Corporation discussed the fact that racially identifiable schools existed and that minority teachers and students were concentrated in "black schools." Trial Tr. 91–92 (testimony of Hollis Hughes, Jr., former member of the Board). In 1976, the School Corporation made only failed attempts, and "not very strong attempts," to dismantle its dual school system. *Id.* at 92. In May 1978, the State of Indiana Office of Schoolhouse Planning forbade construction of new facilities until the School Corporation addressed the problem of racially identifiable schools. *Id.* at 93.

Under pressure from the State of Indiana and the federal government, the School Corporation finally took significant steps to dismantle its dual school system. In December 1978, it adopted an affirmative action hiring program, Resolution 1020. In February 1980, after the federal government had brought suit, the School Corporation entered a consent decree to desegregate its schools by changing its faculty and student assignment policies. Def. Ex. C–1. That consent decree required it to continue its affirmative action hiring programs and report to the federal government its total faculty, by race, until the end of 1983. *Id.* 3 at ¶ 8, 4 at ¶ 10(a). In May 1980, the School Corporation entered a 3-year collective bargaining agreement that included the no-minority layoff provision.

Therefore, the trier of fact on remand could find that the School Corporation had a firm basis for believing it necessary to adopt a remedy even as drastic as the 3-year no-minority layoff provision. For race-conscious remedies, "the nature of the violation determines the scope of the remedy." *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276. Here the School Corporation waited for more than 20 years after *Brown v.*

*Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, to begin to dismantle its dual school system and in the meantime continued its policies of maintaining racially identifiable schools until it was forced to change. Although facially appealing, our inquiry into the constitutionality of the layoff provision does not end with the simple observation that the School Corporation's provision barred the laying off of any black teachers while *Wygant* struck down a plan merely requiring proportional layoffs. Unlike *Wygant* where there was no evidence of intentional discrimination, see *Sheet Metal Workers,* 106 S.Ct. at 3053 (plurality opinion); see also dissenting opinion herein at p. 780 (Cudahy, J.), here a trier of fact could find that the School Corporation reasonably believed that such immediate action was necessary to maintain the present number of black teachers. The provision enabled the School Corporation to preserve its affirmative action hiring gains and to counter the lingering discriminatory atmosphere traceable to its recently abandoned policy of assigning black teachers to "black schools," and to do all this in an *expedited* manner in order to compensate for its past delays in meeting its constitutional obligations—to teachers and students—to "eliminate[ ] root and branch" any vestiges of past discrimination. *Paradise,* 107 S.Ct. at 1066 n. 20, 1067–74; *Green,* 391 U.S. at 437–39, 88 S.Ct. at 1693–94. The temporary layoff provision was not only a remedy for past discrimination against black teachers, but also was part and parcel of the School Corporation's constitutionally mandated efforts to replace its dual school system with an integrated learning environment.

Rather than allowing the trial court to determine if plaintiffs have proven that the layoff provision was not narrowly tailored to its remedial purpose, the plurality here believes that the plan is "invalid because tied to an improper hiring goal." Plurality opinion at p. 772. The hiring policy, Resolution 1020, which mentioned the percentage of minority students as a goal for the percentage of minority teachers, was a separate resolution of the Board of Trustees, and, unlike the one in *Wygant,* not part of,

nor compelled by, the collective bargaining agreement. See *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1158 (6th Cir.1984), reversed, *Wygant,* 476 U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260. That the provision was not tied to any hiring goal is made clear by the fact that any teachers laid off because of the agreement would be hired back first when new openings became available. Def. Brief on Rehearing *En Banc* 23. Because any gains in the percentage of black teachers would evaporate as soon as budgetary constraints eased, the hiring goal would not be furthered. Also, the small number of white teachers who but for the provision would not have been laid off—perhaps only 13 to 16 people—and the less than 1% increase in the fraction of black teachers belie the suggestion that the provision was tied to the hiring goal. *Id.* at 22–24. The School Corporation believes that it can present evidence that it considered in advance the "probable size of the anticipated layoff and the probable effects of [the layoff provision] on the laid-off teachers," *id.* at 7 n. 2, which would not only establish that it was designed to be narrowly tailored, but also show that it was not intended to achieve the goal of equating the percentage of black teachers to black students. Thus further fact-finding, now made necessary by *Wygant,* could dispel this first objection of my brethren.

A second reason advanced by both the plurality and concurrence for holding that plaintiffs have proven that the provision was not narrowly tailored as a matter of law is that it erects an "absolute preference" between the races and places the "entire burden" on white teachers. Their opinions ignore our uncertainty over *inter alia* the extent of past discrimination and its lingering effects, a determination that defines the appropriate extent of the remedy, see *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276, by in effect espousing a *per se* rule that affirmative action programs that can be characterized as creating an "absolute preference for minorities" can never be narrowly tailored.

The shortcoming of this approach is that the validity of an affirmative action pro-

gram will then depend on how one chooses to define the benefits bestowed by that program. Any advantage bestowed on a minority by an affirmative action program can be characterized as an "absolute preference" if just that advantage is considered and as "not an absolute preference" if the chosen referent is the larger objective that the advantage is intended to help minorities obtain. Thus in *United States v. Paradise,* apparently the plurality and concurrence would invalidate the remedy if they chose the referent as the 8 promotions to corporal rank set aside for blacks but would uphold it if they chose the referent as promotion to the corporal rank because blacks had no absolute preference for the remaining 8 openings. See 107 S.Ct. at 1071–72 and n. 30, 1073 (plurality opinion). In *Sheet Metal Workers,* the Supreme Court upheld the court-ordered establishment of a fund which provided only minority youths with part-time and summer sheet metal jobs, counseling, tutorial services, and financial assistance during apprenticeship, stating that there was no absolute preference for minorities to be union members, as opposed to fund beneficiaries. 106 S.Ct. at 3030, 3053 (plurality opinion). Likewise, in the present case the layoff provision does not create an absolute preference for minorities because it did not prevent whites from teaching in the South Bend schools—the vast majority of those positions continued to be held by whites—or from being hired as teachers to fill positions when no qualified laid-off employee was available. Furthermore, the provision was effective for only three years, the School Corporation expected that few teachers would be affected by it, and the School Corporation provided substitute positions to many of those who were affected.

It is true that Justice Marshall's *Wygant* dissent employed the phrase "absolute distinction between the races" to argue that the *Wygant* layoff provision was less burdensome than a no-minority layoff provision. 106 S.Ct. at 1865. But nowhere did he suggest that if an affirmative action program can be characterized as creating an "absolute distinction," then it is not narrowly tailored as a matter of law. Such a *per se* approach is bothersome. Whether a plan can be characterized as creating an "absolute distinction" is but one fact to consider. Given that such a characterization is easily subject to manipulation to produce any desired result, it is not a very probative fact. We should instead weigh the extent of the public employer's interest, the precise burdens imposed on innocent non-minorities, and the adequacy of less onerous alternatives. Here remand is required because, unlike *Wygant,* it cannot be decided if this provision is narrowly tailored without first resolving factual questions which will determine a proper appraisal of all three of these factors.

In the present case the temporary no-minority layoff provision, as drastic as it is, may be necessary to eliminate the effects of the School Corporation's past discrimination and continued default of its constitutional obligations. The concurrence herein is willing to assume that a proportional layoff plan, or even a disproportional layoff plan, may have been supportable by the School Corporation's remedial purpose. However, given the twenty-plus years of delay in dismantling its dual school system and the resultant discriminatory atmosphere discouraging blacks from teaching at its schools, the School Corporation could well have been justified in deciding that a drastic-but-temporary remedy was needed to bring about an immediate break with its segregationist past, even during times of a fiscal crisis. The School Corporation owed no less to its students and faculty and indeed had a burden of coming forward with "a plan that promises realistically to work, and promises realistically to work *now*." *Green,* 391 U.S. at 439, 88 S.Ct. at 1694 (emphasis in original). Reducing the number of black teachers at the very time it was attempting to dismantle its dual school system and provide its students with an integrated learning environment that they had been unconstitutionally denied for twenty-plus years would have undermined these efforts. The unconscionable delays in eliminating the vestiges of discrimination counseled against the School Corporation waiting for an end to its fiscal crisis to

provide that integrated learning environment.

The Supreme Court has recently recognized that drastic short-term remedies may be needed to compensate for lengthy delays in eliminating past discrimination. In *United States v. Paradise*, the Court upheld a court-imposed 50% promotion quota for black Alabama state troopers although the relevant labor pool was only 25% black. 107 S.Ct. at 1068–70, 1071–72 (plurality opinion). The Court concluded that "[i]t would have been improper for the District Judge to ignore the effects of the Department's delay and its continued default of its obligation to develop a promotion procedure, and to require only that, commencing in 1984, the Department promote one black for every three whites promoted." *Id.* at 1072. Instead, the 50% promotion quota "provided an accelerated approach to achieving [the 25%] goal to compensate for past delay" and was consistent with its school desegregation cases which have "recognized the importance of expediting elimination of the vestiges of longstanding discrimination." *Id.* at 1072 n. 30 and n. 31. In the present case a trier of fact could justifiably conclude that plaintiffs failed to prove that the layoff provision was not narrowly tailored to ending the School Corporation's longstanding default of its constitutional affirmative duty to dismantle all vestiges of discrimination. No less burdensome layoff provision might bring about the same benefits as quickly, and the extent of the School Corporation's past discrimination and delays could justify the burdens imposed; therefore, remand is necessary.

The efforts of the School Corporation to meet its constitutional obligation to replace its dual school system with an integrated learning environment and to eliminate the lingering effects of its discrimination against black teachers cannot be lightly dismissed. Without further fact-finding as to the extent of the School Corporation's compelling interest, the burdens imposed on innocent white employees, and the ade-

quacy of less onerous alternatives, this Court cannot determine whether the School Corporation's layoff provision is narrowly tailored. Plaintiffs' failure to meet their burden of proving the invalidity of the provision cannot be masked by reliance on talismanic factors shortcutting important factual determinations and yielding clear yet erroneous results. Therefore I respectfully dissent.

CUDAHY, Circuit Judge, with whom Circuit Judges CUMMINGS, WOOD, Jr., and FAIRCHILD join, dissenting:

We are dealing here with a race-conscious layoff plan, voluntarily adopted by a school board under heavy government fire for past discrimination and ratified by secret ballot by the teachers affected.[1] What is most striking about this case is the kaleidoscope of legal scenery against which the facts have been projected at various times in the process. The adoption of the plan and its review by the district court and by the panel of this court all occurred at times when the Supreme Court was providing little guidance about the legal bounds of such a plan. It is therefore not surprising that in the district court the judge and the school board were looking over their shoulders at the "role model" theories espoused by the district court in *Wygant v. Jackson Bd. of Educ.*, 546 F.Supp. 1195 (E.D.Mich. 1982). *Britton*, 593 F.Supp. 1223 (N.D.Ind. 1984). On appeal, the panel majority, for which I wrote, was most concerned with *Janowiak v. Corporate City of South Bend*, 750 F.2d 557 (7th Cir.1984), *vacated and remanded*, —— U.S. ——, 107 S.Ct. 1620, 95 L.Ed.2d 195 (1987), an affirmative action case in which the same district court that decided *Britton* had recently been reversed. The panel majority certainly did not rely on a role model theory and, in fact, expressly renounced reliance "on any particular theory of role modeling." *Britton*, 775 F.2d 794, 800 n. 8 (7th Cir.1985). Subsequently, the Supreme Court reversed

---

1. The panel opinion affirming the district court in this case is found at 775 F.2d 794 (7th Cir. 1985). It contains an extensive statement of the background of this case, including the facts of past discrimination, and I rely on it here particularly in that respect.

*Wygant* in a series of opinions, none of which commanded a majority, that present a confusing array of essentially new law. 106 S.Ct. 1842 (1986). Among other things, the plurality opinion soundly rejected the role model rationale.[2] Soon thereafter, the Supreme Court decided four more cases in which it upheld the validity of race-conscious remedial plans and further elaborated on the standards for acceptance. *Johnson v. Transportation Agency,* ⸺ U.S. ⸺, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *United States v. Paradise,* ⸺ U.S. ⸺, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* ⸺ U.S. ⸺, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* ⸺ U.S. ⸺, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). Because of the extreme fluidity of the law and the consequent striking shifts in the relevance of various facts, it would be much better practice to remand to the fact-finder—the district court—to determine in the first instance the disposition of this case in light of these recent Supreme Court decisions. I therefore respectfully dissent and join Judge Cummings and Judge Fairchild in their dissents.

The plurality opinion here is at great pains to show that this is a "worse" case than *Wygant* and hence more deserving of unceremonious reversal. In fact, now (and probably even more clearly after further fact-finding in the district court) this case is unmistakably different from *Wygant.* In the district court and in the court of appeals, the record in *Wygant* was unambiguously that of a "role model" case. The record there provided a basis for increasing the percentage of minority teachers only for the purpose of furnishing enough role models for minority children or, alternatively, to compensate for societal discrimination. By contrast, in the case before us, there is solid record support for the school board's concerns in instituting a plan to redress its own past discrimination against black teachers in hiring.

Four of the five Justices voting to reverse in *Wygant* expressly rejected the lower courts' determinations that the goals of providing role models and remedying societal discrimination were sufficient to justify the challenged layoff provision. 106 S.Ct. at 1847–48 (plurality opinion); *id.* at 1854 (O'Connor, J., concurring). Seven Justices, however, stated (and the remaining two Justices did not disagree) that the elimination of the effects of a public body's own past or present discrimination is a constitutionally valid purpose for that body's use of a race-conscious remedy. *Id.* at 1848 (plurality opinion); *id.* at 1854–57 (O'Connor, J., concurring); *id.* at 1863 (Marshall, J., dissenting). Justice O'Connor, who cast the decisive fifth vote, summarized what she viewed as the areas of Court "consensus" in *Wygant:*

> The Court is in agreement that ... remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program. This remedial purpose need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required.

*Id.* at 1853. Adoption of remedial measures does not demand a contemporaneous finding by a court or other body that the public actor actually discriminated. *Id.* at 1848 (plurality opinion); *id.* at 1854–57 (O'Connor, J., concurring); *id.* at 1863 (Marshall, J., dissenting); *id.* at 1867 (Stevens, J., dissenting). As Justice O'Connor argues, requiring public employers to make findings that they had in fact illegally discriminated before they can undertake race-conscious remedies would obviously put a

---

**2.** A majority of the Justices in *Wygant* also rejected the requirement in *Janowiak* that affirmative action programs "be based upon findings of past discrimination by a competent body," 750 F.2d at 561. *See infra* 779–80. The Court has recently vacated the judgment in *Janowiak* and remanded the case to this court "for further consideration in light of *Johnson v. Transportation Agency,* [⸺ U.S. ⸺, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) ] and *Wygant v. Jackson Bd. of Educ.,* [476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) ]."

high price on remedial measures. Such employers would have a rough road to follow in fulfilling their constitutional duty to take affirmative steps to eliminate the continuing effects of past discrimination. *Id.* at 1855–56 (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. New Kent County School Bd.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)). Of the eight Justices who comment on this issue in *Wygant,* those who demand the most of the employer would not require a dauntingly rigorous showing. They would demand only that, if the lawfulness of a plan is later challenged, the employer present the trial court with sufficient evidence to allow the court to determine "that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.* at 1848 (plurality opinion).

The main reason the Supreme Court did not remand *Wygant* to a lower court was that there the only evidence of past hiring discrimination was contained in "lodgings" submitted by the defendant *after* the case had been brought up from the Sixth Circuit. The plurality refused to consider the "non-record documents that respondent has 'lodged' with this Court," citing "the heretofore unquestioned rule that this Court decides cases based on the record before it." *Id.* at 1849 n. 5. The plurality said that, where the defendant's asserted purpose is to remedy its past discrimination, "there is no escaping the need for a factual determination below—a determination that does not exist [in *Wygant*]." *Id.* In like vein, Justice O'Connor found that it was unnecessary to remand because the layoff provision there acted "to maintain levels of minority hiring that have no relation to remedying employment discrimination." *Id.* at 1857. She noted the obvious—that the discrepancy between the percentage of black teachers and black students, on which the defendant had relied in support of its role model theory, was "not probative of employment discrimination." *Id.*

Not only was the record in *Wygant* devoid of any evidence of past employment discrimination, but, in fact, there had been two judicial findings that the school board in *Wygant* had not engaged in past discrimination in employment. A Michigan court had found that it " 'ha[d] not been established that the board had discriminated against minorities in its hiring practices. The minority representation on the faculty was the result of societal racial discrimination.' " *Id.* at 1845 (plurality opinion) (quoting *Jackson Educ. Ass'n. v. Board of Educ.,* No. 77–011484CZ (Jackson County Cir.Ct.1979)). Earlier, in a suit brought by laid-off minority teachers seeking to require the Jackson Board to observe the race-conscious preferential layoff provision, a federal district court concluded "that it lacked jurisdiction over the case, in part because there was insufficient evidence to support the plaintiffs' claim that the Board had engaged in discriminatory hiring practices prior to 1972." *Id.* at 1845 (plurality opinion) (discussing *Jackson Educ. Ass'n. v. Board of Educ.,* No. 4–72340 (E.D.Mich. 1976)). No wonder Justice O'Connor felt no need to remand *Wygant* for a determination of how the layoff provision related to apparently non-existent past discrimination in employment.

The situation in South Bend was markedly different. The South Bend schools were racially segregated by statute until 1949–only five years before *Brown v. Board of Education*—and continued as a dual system at least into the mid–70's. The Office for Civil Rights (the "OCR") of the then Department of Health, Education and Welfare ("HEW") conducted on-site reviews of the South Bend schools in 1969 and 1975. Defendants' Exhibit ("Def. Ex.") M–3; Def. Ex. M–6. The OCR reviewed complaints it received about the South Bend School Corporation's discriminatory practices as well as information supplied by the School Corporation itself. *Id.* The OCR came down with a clear indictment of the School Corporation in a series of letters in 1975 and 1976. A letter dated March 13, 1975 described evidence that the School Corporation discriminated against minorities in the recruitment, hiring and promotion of teachers and that it maintained a dual school system in which pre-

dominantly black schools received substantially less financial and other support than predominantly white schools. Def. Ex. M–6. The OCR wrote again on October 6, 1975, bluntly conveying its finding that the School Corporation had violated Title VI of the Civil Rights Act of 1964 by creating racially identifiable schools and therefore had "an obligation to undertake sufficient remedial action to eliminate the vestiges of its racially discriminatory teacher assignment policies and practices." Def. Ex. M–3, at 2. This letter ordered the School Corporation to submit within forty-five days a plan to remedy its violations. By a letter dated March 8, 1976, the OCR spe·"fically required that the plan include assurances that the School Corporation would maintain nondiscriminatory practices for the recruitment, hiring and assignment of teachers. Def. Ex. M–2, at 4.

On July 20, 1976, the United States District Court for the District of Columbia ordered HEW to commence enforcement proceedings against the School Corporation unless HEW determined that the Corporation was in compliance with Title VI. *Brown v. Weinberger,* 417 F.Supp. 1215, 1221, 1223–24 (D.D.C.1976) (naming the School Corporation as one of twenty-six districts "found in violation of [Title VI] after HEW investigations, many of which were very lengthy, as long as seven years in duration, before being concluded with findings of default") (*Brown* admitted as Def. Ex. M–7). Subsequently, the federal government determined that the School Corporation had not taken adequate corrective measures and filed suit alleging that "the South Bend Community School Corporation ... ha[s] engaged in acts of discrimination which were intended and had the effect of segregating students and faculty on the basis of race in the school system." Def. Ex. C–1, at 1 (consent order). The School Corporation agreed to a consent decree on February 8, 1980. In a subsequent opinion, the district court noted that the desegregation plan adopted on February 21, 1981 "was the first comprehensive plan of its nature ever adopted for the benefit of students attending the schools within the defendant corporation. The filing of the Plan of Desegregation came twenty-seven years after *Brown v. Board of Education,* during which period two generations of students passed through the school system." *United States v. South Bend Community School Corp.,* 511 F.Supp. 1352, 1356 n. 4 (N.D.Ind.1981), *aff'd,* 692 F.2d 623 (7th Cir.1982).

The consent decree provided, *inter alia,* that "[t]he Board of School Trustees shall continue to pursue its present affirmative action hiring policies," Def. Ex. C–1, at 3, and report to the federal government for the next four years "the total faculty, by race, of the School Corporation," *id.* at 4. Thus, in 1980, when the provision at issue here was adopted, the effect of past discrimination against black teachers and job applicants was thought serious enough to warrant the imposition of affirmative action programs for hiring black teachers. These programs were to be monitored by the federal government until the end of 1983. Here, with plenty of record evidence of past discrimination, the district court should be accorded an opportunity to determine whether the level of minority hiring was closely related to the goal of correcting past discrimination.

The plurality opinion here seeks to deny much of this background by pretending that history began only in 1972 (or perhaps 1978). The plurality opinion cites hiring statistics achieved only under the federal lash in the 1970's as being somehow representative of the "past" in South Bend. This is like starting the history of slavery with the Emancipation Proclamation. The Supreme Court has repeatedly chastised the lower courts for ignoring history. The Court has charged school authorities with a continuing affirmative duty to eliminate all vestiges of past racial discrimination regardless of when the discriminatory acts took place. In *Keyes v. School Dist. No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Court stated:

> The courts below attributed much significance to the fact that many of the Board's actions in the core city area antedated our decision in *Brown.* We reject any suggestion that remoteness in time

has any relevance to the issue of intent. If the actions of the school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less "intentional."

*Id.* at 210–11, 93 S.Ct. at 2698. Similarly, in *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court rejected a desegregation plan that would give all students the freedom to choose a public school because the plan did not fulfill the school board's "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.* at 437–38, 88 S.Ct. at 1693–94; *see also Wygant*, 106 S.Ct. at 1856 (O'Connor, J., concurring) (states have a "constitutional *duty* to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination") (emphasis in original); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971) ("The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation.") (emphasis added).

The plurality opinion, rather naively it seems to me, also states that, although the School Corporation may have engaged in racial "steering" by assigning black teachers to black schools, this has nothing to do with discrimination in hiring. In fact, the lead opinion claims that segregating black teachers in black schools may improve their employment prospects. No doubt this was true during the many years when legally segregated schools in the South provided the only market for black teachers. But attitudes, in most quarters at least, have changed markedly since those Jim Crow days.

Under modern conditions, we may safely assume that a dual school system presents an uninviting prospect to black job applicants. When a school board maintains racially identifiable schools, provides the black schools with less financial and other support than the white schools and staffs the black schools with black teachers who are given much less opportunity for promotion than are white teachers in the white schools, the school board sends a message that "blacks need not apply" for jobs. Systems where blacks are treated equally obviously present more attractive opportunities. The School Corporation failed to dismantle its segregated system, ignoring the fact that "[m]ore than twenty years ago the Supreme Court expressed impatience for what it considered to be intolerable delays in the face of its clear and unambiguous decisions," *Wade v. Hegner*, 804 F.2d 67, 72 (7th Cir.1986). Because of this foot dragging, the trier of fact could reasonably adopt a working hypothesis that the resulting atmosphere of discrimination produced fewer black teachers than would have been the case under a constitutional regime.

The Supreme Court has employed an analogous inference to justify the imposition of race-conscious remedies:

An employer's reputation for discrimination may discourage minorities from seeking available employment.... In these circumstances, affirmative race-conscious relief may be the only means available "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."

*Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, —— U.S. ——, 106 S.Ct. 3019, 3036–37, 92 L.Ed.2d 344 (plurality opinion) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)). In *Sheet Metal Workers*, the plurality relied on, *inter alia*, the trial court's "determination that the union's reputation for discrimination operated to discourage nonwhites from even applying for membership," to uphold a twenty-nine percent minority membership goal.

In the school desegregation context, the Supreme Court has held that where a court finds that a school board has intentionally segregated students on the basis of race in a "meaningful portion" of a school system, any other segregation existing in the

school system will be presumed the result of unlawful discrimination. *Keyes*, 413 U.S. at 208, 93 S.Ct. at 2697. The school authorities will then bear the burden of rebutting the prima facie case of unlawful segregative intent. The Court recognized that "there is high probability that where school authorities have effectuated an intentionally segregative policy in a meaningful portion of the school system, similar impermissible considerations have motivated their actions in other areas of the system." *Id.*

The efforts of the plurality to uncouple discriminatory hiring practices from other sorts of discrimination—primarily segregative practices—is not only naive, it is dangerous. It suggests the re-emergence (unintended I am sure) of a *Plessy v. Ferguson*—separate but equal—sort of approach. The long history of discrimination in this country teaches that those who would keep blacks down by keeping them apart are also likely to keep them away in the first place. An intent to segregate operates in tandem with an intent to exclude. Hence, all the evidence of past discriminatory practices by the South Bend Community School Corporation weighs on the scales determining the need for remedial action.

The plurality asserts that, even if the record does contain evidence of past discrimination by the School Corporation, the record contains no evidence, nor did the School Corporation argue at trial, that the decision to adopt the layoff plan was motivated by a desire to remedy that discrimination. This is not correct. The School Corporation argued at trial that a remedial purpose motivated the adoption of Resolution 1020 calling for increases in minority hiring—remedial increases that the layoff provision was designed to preserve. The School Corporation's counsel declared in his opening statement at trial:

> We will have, perhaps, a bit of evidence with respect to the relationship between that—no minority layoff clause and what was referred to as Resolution 1020 which was a resolution of the Board of Trustees passed in November or December of 1978 at which time the School

Corporation for the first time in any formal sense adopted an employment policy reflecting, in effect, or at least [an] antecedent of an affirmative action plan.

> It occurred at a time in the mid '70's following inquiries by State authorities and the Federal Justice Department concerning the fact there was—there were racially identifiable schools within the system and the focus of the entire community reflected by the Board of Trustees and the administration centered upon rectifying that situation.

> It ultimately culminated in litigation and a consent order of which I am sure this Court is very familiar, the consent order entered in the segregation case on February 8, 1980.

Trial Transcript at 12 (Apr. 26, 1984).

Hollis Hughes, Jr., a member of the Board of Trustees at the time of the adoption of the hiring goal, testified at trial that he had believed "there was [a] need for an Affirmative Action policy" at the time Resolution 1020 was adopted. *Id.* at 89. He said that the Board had discussed at its meetings the fact that racially identifiable schools existed, *id.* at 91; that the minority teachers were concentrated along with minority students in racially identifiable schools, *id.* at 92; that attempts were made "in approximately '76 to correct some of that imbalance, although not very strong attempts it appeared," *id.;* that as a member of the Board he was familiar with the federal government's concerns in the late 1970's over the discriminatory assignment policies, *id.;* and that "the School Corporation was notified in May of 1978 by the [State of Indiana] Office of Schoolhouse Planning that it could not proceed with any construction of new facilities until such time as it addressed the issue of racially imbalanced schools in the district," *id.* at 93. Hughes testified that the layoff provision was intended to preserve the affirmative action hiring gains. *Id.* at 95–96. He also testified about the origins of the affirmative action hiring program: "The evolution of the Resolution 1020 started with a former Board of Trustees member, Mrs. Eugenea Braboy, who upon leaving the

Board made a very strong statement to the effect that racial imbalance and the issue of racial improprieties within the school district needed to be addressed." *Id.* at 90. The School Corporation also introduced at trial documentary evidence of its remedial purpose, including the correspondence between HEW and the School Corporation and minutes of meetings at which the school board heard testimony that qualified black applicants for teaching positions had been refused employment because of their race. Def. Ex. K-2.

Based on the evidence in the record, it is ridiculous to claim, as does the plurality, that the School Corporation's layoff provision was, as a matter of law, not intended to further a remedial purpose. The fact that the School Corporation may also have been motivated by a noncompelling interest, such as that supplied by a role model theory, does not cancel out or dilute the compelling remedial purpose.

The plurality erroneously suggests that *only* statistical comparisons of hiring percentages with percentages of qualified applicants within the relevant labor pool are probative of job bias. Of course, courts routinely consider other, more direct, evidence of discrimination and, in fact, permit the use of statistical evidence largely because it is often the only evidence available. As the Supreme Court noted, "Statistics showing racial or ethnic imbalance are probative ... only because such imbalance is often a telltale sign of purposeful discrimination.... 'In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved.'" *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977) (quoting *United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (citing cases), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971)). Although we have in the record minority teacher percentages (*e.g.,* 3.5% in 1963–64) that are, at least, strongly suggestive, the record does not seem to contain labor pool statistics. We do not know whether these statistics exist or what they would reveal if

they do exist. This is an inquiry which the trier of fact could reasonably undertake on remand. The district court could also determine exactly how probative of past employment discrimination were the other facts of record, many of which we have recited here.

Justice O'Connor would require a remedial plan to be " 'narrowly tailored' to achieve its remedial purpose," *Wygant,* 106 S.Ct. at 1857; the plan must implement "that purpose by means that do not ... unnecessarily trammel the rights ... of innocent individuals directly and adversely affected by a plan's racial preference," *id.* at 1853–54. And I certainly agree that this aspect of affirmative action is of crucial importance. In this connection, the defendants described in their brief on rehearing *en banc* additional facts that may now be relevant in light of the Supreme Court's recent affirmative action opinions. Defendants' Brief on Rehearing *En Banc* at 21–25. Those facts include measures by the School Corporation to minimize the impact of the layoffs on white employees. For example, the collective bargaining agreement provided that any teacher laid off during the term of the agreement would be recalled first when the School Corporation began hiring teachers again. In addition, the agreement created fifteen permanent substitute positions to be filled by the laid-off white teachers in order of seniority and gave the laid-off teachers preferential rights to temporary substitute positions, for which they were paid a daily rate equal to the amount of their permanent annual salary divided by the number of days in the school year. The defendants contend that only thirteen to sixteen of the plaintiffs would not have been laid off under a straight seniority layoff and that all laid-off teachers had the opportunity to substitute teach a high percentage of the time. *Id.* at 23–24. Given these facts, the defendants argue, the layoff provision for the three-year life of the agreement is narrowly tailored to achieve the School Corporation's goals of remedying the effects of the prior racially discriminatory hiring practices and achieving a racially integrat-

ed faculty. If the case were remanded, the district court could explore the significance, if any, of these and other additional facts relating to the layoff provision. And the court could make findings about the appropriateness of the layoff provision measured against the court's assessment of the precise nature of the School Corporation's compelling purpose.

Permitting the district court to receive new evidence does not give the defendants two bites at the apple. Because of the radical shift in legal premises between the time of trial and the time of this *en banc* decision, the defendants have been unfairly handicapped in their effort to adduce relevant evidence. What evidence is relevant has been a question with rapidly changing answers over the life of this case. It is unfair to expect the defendants to have presented all the best evidence against a backdrop of rapidly changing legal rules.

I have no idea what conclusion the district court would reach on remand. I have outlined some of the factors which I think could figure in the making of additional findings on remand as well as the areas where additional evidence might be helpful. But I do think that the district court that found the original facts, and that might have found important additional facts, is in a better position than we to apply in the first instance the new Supreme Court law to those wide-ranging facts. This is the orderly and conservative method of addressing the issues. There is no need for a rush to judgment.

We as a society still have a great deal of work to do in remedying our legacy of discrimination against minorities. But whatever we do must not unnecessarily or unfairly infringe on the rights of individual members of the majority. The South Bend Community School Corporation and its teachers deserve high commendation for their good faith efforts to meet the obligations of justice in these respects. As the Supreme Court continues to clarify the boundaries of permissible action, I hope other employers and their employees will undertake in good faith to set right old wrongs in accordance with new, clearer and, hopefully, more just rules.

I respectfully dissent.

FAIRCHILD, Senior Circuit Judge, with whom Circuit Judges CUMMINGS, WOOD, Jr., and CUDAHY join, dissenting. I address one additional facet of the case which I find troubling.

The judges in the majority decline to direct the district court on remand to decide whether the Board had an adequate basis for belief that affirmative action was required to remedy past discrimination. They consider that inquiry unnecessary because they conclude that in any event, the formula included in the 1980–83 collective bargaining agreement went too far.

With all respect, it seems to me that if there were a proper basis for remedial action, overbreadth of the formula should not end the case.

Assuming that the majority is correct in determining that the formula cannot be sustained, particularly under worst-case scenarios, I suggest that the focus should then be on whether the departure from strict seniority which actually occurred can, in whole or in part, be justified as affirmative action by finding whether the Board had an adequately based belief that past discrimination required remedial action.

We know that before the 1982 lay-off, 13.0% of the teachers were black. Upon the lay-off, the percentage increased to 13.8%. Did the Board then have an adequate basis for belief that there had been discrimination against blacks in the past? Did it have an adequate basis for belief that but for the discrimination, the percentage would have been 13 or some higher figure? If the facts were developed on remand and would justify affirmative action sufficient to maintain 13%, only those plaintiffs who would not have been laid-off if only the 13% level were maintained would be entitled to relief.

Put another way, if the formula went too far, then accepting the principle that properly based affirmative action is permissible, *Wygant*, 106 S.Ct. at 1847, it seems to follow that recovery in this case should be

limited to those plaintiffs whose lay-offs fell between what action would have been permissible and what was actually done.

I am aware that in *Wygant* the majority of the justices of the Supreme Court focused on the formula as is being done here. Respectfully, however, it seems to me that there is room to address whether, and to what extent, the departures from strict seniority which actually occurred were justified as a remedy for a level of minority representation held down by past discrimination.